Ronald P. Anselmo and Kay W. Anselmo, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 19748–80.    Filed May 12, 1983.

*Mortimer M. Caplin, Ralph A. Muoio,* and *Stafford Smiley,* for the petitioners.

*James F. Kearney,* for the respondent.

Whitaker, *Judge*: Respondent determined deficiencies in petitioners' income tax for the calendar years 1977 and 1978 in the amounts of $12,874 and $19,207, respectively. The sole issue for our consideration is the fair market value of colored gems[1] donated by petitioners to the Smithsonian Institution in 1977.

---

[1]Colored gems are defined as cut and polished precious or semi-precious stones other than diamonds. All the gems in issue come within this definition. The gems involved in this case are, for convenience, referred to either as gems or stones (plural or singular) interchangeably.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The parties have stipulated that Ronald P. Anselmo (hereinafter petitioner) and his wife Kay W. Anselmo resided in Fort Lauderdale, Fla., when the petition in this case was filed.

On their 1977 individual income tax return, petitioners claimed a charitable contribution deduction with respect to the donation of gems to the Smithsonian Institution. They listed the fair market value of the gems as of the date of the gift as $80,680. Because of the percentage limitation in section 170(b),[2] petitioners limited the amount of their 1977 claimed charitable contribution deduction to $43,357, all but $1,410 of which was attributable to the donation of the gems. They carried over to their 1978 return the unused portion of this deduction.

In his notice of deficiency, respondent determined that the fair market value of the gems had been $16,800 as of the date of contribution. Respondent reduced petitioners' charitable deduction for 1977 accordingly and allowed no carryover deduction for 1978. By way of amended answer, respondent now claims an increased deficiency, arguing that the fair market value of the gems on the contribution date was only $9,295.

Petitioner is a partner in a Fort Lauderdale, Fla., law firm, specializing in real estate. Prior to March 1977, he had made investments of various types, including real estate, but had not invested in colored gems. In January or February 1977, petitioner learned of the possibility of buying gems through Willard Dover, a partner in petitioner's firm, and Robert Karoly, an investment adviser with R. G. Wilson & Co. Inc. (hereinafter Wilson) of Fort Lauderdale. Petitioner was provided with promotional literature stressing the tax benefits from purchasing gems[3] and then subsequently donating them to

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended.

[3] A letter from Wilson which was shown to petitioner stated in part as follows:

500% TAX SHELTER WITHOUT RECAPTURE

A TAXPAYER DONATES A CAPITAL GAIN PROPERTY TO A QUALIFIED CHARITY!

He is entitled to a tax deduction equal to the fair market value of his donation, which includes a capital gain representing several times the original acquisition cost.

charities. He was also advised of the fact that colored gems had appreciated rapidly in value in recent years. Mr. Karoly advised petitioner that he had contacts in South America through which he could obtain gems at mine price levels which were far below the retail value of the gems.

On March 3, 1977, petitioner entered into a contract with Wilson under which Wilson agreed to purchase gems on his behalf. Petitioner knew that the gems would probably be amethysts, tourmalines, or aquamarines, but the specific quantity, quality, and size of the gems was left to the discretion of Wilson. The contract provided that $15,000 worth of gems would be purchased by Wilson and that Wilson's commissions, acquisition costs, and expenses were included within this $15,000 amount. The contract provided further:

(4) Wilson shall obtain written appraisals at its own cost and expense, from at least two independent recognized U.S. appraisers, which appraisers shall attest that the U.S. retail replacement value of the purchased gemstones shall be *$75,000* (or approximately five (5) times the amount of your purchase price) at the time of purchase. * * *

On or about March 21, 1977, or March 22, 1977, Douglas S. Crucet, acting as agent for petitioner pursuant to petitioner's contract with Wilson, purchased 461 individual stones of the following types:

| Gems | Approximate weight |
|---|---|
| Lot of 4 emerald-cut aquamarines | 56.38 carats |
| Lot of 4 emerald-cut aquamarines | 64.92 carats |
| Lot of 4 emerald-cut aquamarines | 63.35 carats |
| Lot of 4 cushion-cut aquamarines | 37.87 carats |
| One oval-cut natural blue topaz[4] | 6.95 carats |
| One bicolor emerald-cut faceted tourmaline | 32.60 carats |

R. G. Wilson & Company is in the unique position of being able to arrange purchases abroad of precious gems at *mine price levels* at a fraction of their retail value. In the United States the Smithsonian Institution or the Gemological Institute of America provides proper identification and authentication of these gems. The taxpayer will also receive two appraisals from recognized appraisers. All gems are delivered directly to the buyer's bank. Since the property *must* be held for at least nine months to establish the "capital gain" status to qualify for a tax deduction in the current year, we recommend all purchases should be made prior to March 15, 1977.

[4]The blue topaz was identified initially as an aquamarine and valued as such in the three appraisals furnished by Wilson and in that of Dr. Joel Arem. It was only after particular tests were performed on the stones—after respondent's audit had begun—that the mistaken identity was discovered. Petitioner recognizes that since the stone is a blue topaz, not an aquamarine, it has a substantially lower value than in the four valuations mentioned above.

Lot of 12 × 14mm oval amethysts .............. 254.00 carats
13 parcels of 12 × 16mm oval amethysts ... 3,337.00 carats

Petitioner acquired title to these gems when Mr. Crucet purchased them.

The gems were transported from Brazil to the United States and delivered to petitioner in his office in Fort Lauderdale on or about May 10, 1977. Petitioner was also provided with the following three written appraisals of the gems:

| Appraiser | Date | Basis of appraisal | Appraised value of gems |
|---|---|---|---|
| Colin Curtis | Apr. 28, 1977 | Retail value | $80,679.70 |
| Randolph D. Oehmig | Apr. 28, 1977 | Retail value | 80,679.70 |
| George S. Williams | May 6, 1977 | Replacement value in line with current retail prices | 80,679.70 |

These three appraisals were virtually identical in their description of the gems and the values assigned to each parcel. Messrs. Curtis and Oehmig were partners and both their appraisals stated that the values were based upon the assumption that the stones would be offered individually at retail, rather than in lots or parcels. Mr. Oehmig's appraisal stated that he concurred with that of Mr. Curtis. Mr. Williams' appraisal stated that he had reviewed the appraisals by Messrs. Curtis and Oehmig and found the replacement value in line with current retail prices.

In December 1977, petitioner proceeded to complete the donation of the gems to the National Museum of Natural History, Smithsonian Institution. On December 22, 1977, the gems, along with the appraisals of Messrs. Curtis, Oehmig, and Williams, were delivered to Dr. Joel E. Arem, an independent gemologist and gem dealer. Dr. Arem was asked to confirm whether the appraised values were in line with the market at that time. Because he was not asked to do a complete appraisal of the gems but only to verify the values placed on them in the prior appraisals, Dr. Arem did not conduct the full battery of tests which he would normally employ on each individual stone. Rather, he checked at random some of the gems to

---

However, because of the quantity of stones involved here, this mistake has only a slight effect on the overall valuation.

verify that they were aquamarines, amethysts, and a tourma-line, weighed them, and performed other tests and analyses that he deemed necessary. He then determined the average per-carat retail value of the gems, with the valuation based upon the assumptions that the descriptions in the prior appraisals were correct and that the gems would be sold to customers by retail jewelry stores, in the form of jewelry such as rings. Dr. Arem did not prepare a formal appraisal report when he examined the gems but made only brief, handwritten appraisal notes at that time. Subsequently, on September 16, 1978, after respondent's agents questioned the valuation of the gems, Dr. Arem prepared a typewritten appraisal report, which was based on his appraisal notes and his memory of having viewed the gems 9 months earlier.

On December 30, 1977, petitioner's gems were donated to the Smithsonian Institution. Because of the low quality of the gems, the Smithsonian Institution intended to use them for study or laboratory purposes but not as exhibit stones.

Typically, colored gems mined abroad pass through several stages of distribution, with prices marked up considerably at each stage. First, the gem-bearing minerals are extracted from the mine. The miner sells the minerals to a cutter, who in turn sells cut stones to exporters. From the exporters, the stones are sold to U.S. importers. These in turn sell to wholesalers or manufacturing jewelers. The wholesalers sometimes sell di-rectly to jewelry stores but more often sell through intermedi-ary wholesale dealers, local distributors, or jobbers. Manufac-turing jewelers mount stones into settings and sell the preset jewelry to jewelry or department stores, either directly or through jobbers or other middlemen.

The chain of distribution often varies, however, from the pattern described above. One or more of the links in the chain may be eliminated in a particular transaction. For instance, larger manufacturing jewelers often bypass importers and buy stones directly from exporters, yet they may also occasionally buy stones from wholesalers. Another variation in the distri-bution chain is caused by the existence of memorandum houses, located in New York City, Los Angeles, and a few other large cities, which supply individual stones to jewelry stores on invoice or, more commonly, on consignment. Memorandum houses acquire their gems either directly from exporters or by

purchasing stones from domestic importers or wholesalers. A typical, large memorandum house would have an inventory at any given time of approximately 1,000 amethysts, not more than 75 of which would be of a size and quality similar to petitioner's stones.

Most of the jewelry sold to individuals is preset jewelry obtained from manufacturers, but some sales are of jewelry where the jewelry store completes manufacture by setting loose stones it has obtained from a wholesaler in mountings made or purchased by it. In a small percentage of sales, jewelers may also allow a customer to select loose stones, which are then mounted by the jeweler in a setting also selected by the customer.

In 1977, approximately 60 percent of the colored gem jewelry purchased by individuals in the United States was bought in jewelry stores. Another 10 percent was bought in department stores. Craft fairs accounted for an additional 7 percent of sales, and another 8 percent was sold by door-to-door or mail-order distributors or private dealers/wholesalers. The remainder was disposed of through a wide variety of outlets.

The gems donated by petitioner were substantially lower in quality than the typical stones passing through the chain of distribution. Jewelry containing gems of this type and quality would generally not be sold by jewelry stores which emphasize quality merchandise. However, catalog and discount stores, as well as jewelry stores catering to less selective customers, would sometimes sell jewelry containing gems like those involved here.[5] The record establishes that a jewelry store would carry in inventory at most only a few unset stones of the types and qualities involved here. Often a store would not even carry such stones, but it could obtain them from a memorandum house in response to a customer's request for a particular type of gem. These jewelry stores would not sell the unset gems as such to individual purchasers. Invariably, loose stones were made a part of rings, pendants, or other jewelry before being delivered to individual purchasers. We therefore find as a fact that members of the public did not purchase unset gems

---

[5] The only exception is with respect to the blue topaz and the bicolor tourmaline, which were of very low quality and were not the types of stones normally set in jewelry.

like those donated by petitioner; their purchases were of jewelry of which the gems would be component parts. We further find that such jewelry is normally sold to the retail customer at a fixed price without a separate statement of the prices, values, or costs of the setting and of the stone or stones. There is no evidence in the record that it is customary for jewelry stores to charge retail customers separate prices for the gem and the setting in which it is mounted.[6] In fact, we know that such is not the custom for the type of low quality jewelry involved here.

Once set into jewelry, an unset gem has been consumed and is not viewed as an item separate and apart from the jewelry in which it is mounted. We therefore find that the ultimate consumers of gems like petitioner's are manufacturing or retail jewelers that use the unset gems in the creation of jewelry.[7] The record indicates that most of the stones like petitioner's are mounted by manufacturing jewelers, who then sell preset jewelry to jewelry stores, either directly or through intermediaries. But, some quantities of other such unset stones are sold each year by wholesalers and memorandum houses to jewelry stores,[8] which then create items of jewelry by setting the stones. Because jewelry stores carry in inventory so few stones like petitioner's, or obtain them from memorandum houses only in response to particular customer requests, we find that the only purchases made by jewelry

---

[6]Jewelers' Circular-Keystone, a trade publication, reports each month on the general per-carat price ranges that jewelers charged their retail customers for various types of stones. These lists do not establish that retail customers were actually charged separate prices for the stones and the settings. Moreover, the lists are useful only in detecting pricing trends and cannot be relied upon in valuing particular stones because, as the lists themselves point out, slight variations in color and clarity can cause dramatic differences in price.

[7]Both parties and the witnesses refer to jewelry stores, department stores, and other outlets as retailers, and the sales by wholesalers or memorandum houses to jewelry stores as sales at wholesale. We believe that use of the terms "wholesale" and "retail" in this manner is inappropriate in this case because jewelry stores and other retail outlets do not make bulk purchases of stones like petitioner's. "Wholesale" is defined as "the sale of commodities in quantity usually for resale," and "retail" is defined as "the sale of commodities or goods in small quantities to ultimate consumers." Webster's New Collegiate Dictionary 1338, 988 (1975).

[8]We cannot on this record make a definite determination of the particular number of such unset stones sold by wholesalers or memorandum houses to jewelry stores each year, but we are convinced that, despite the relatively small number of such stones carried in inventory by individual jewelry stores and memorandum houses, it represents a sufficiently significant market for purposes of this case.

stores of such stones are in small lots or on an individual stone-by-stone basis. We find that these sales by wholesalers or memorandum houses to jewelry stores provide the only significant market for the sale in small quantities of unset gems like those involved here, since manufacturing jewelers, like wholesalers and memorandum houses, obtain unset stones through bulk purchases. In terms of numbers of gems sold nationwide, the sales by wholesalers and memorandum houses to jewelry stores represent a substantial market and are the last stage of the chain of distribution at which significant sales of unset gems like petitioner's are made.

There is some testimony concerning the ability of individual purchasers to buy gems directly from wholesalers. The record shows that a person who understands how wholesalers operate can purchase gems directly from the wholesaler, particularly if he is seeking to make a bulk purchase. Yet the record also establishes here that individuals would not purchase from wholesalers unset gems like those donated by petitioner because of the low value of each gem and the difficulty of reselling them. Thus, there was no wholesale market for sale to the public of unset gems like those involved here.

Some of the testimony focused on the existence of a "tax shelter market," which provided an alternative path for the distribution of gems. The distribution of gems in a tax shelter market involves the customer's buying a large quantity of gems at an early stage of the distribution chain, thus eliminating much of the profit normally earned by middlemen, but this is countered at least in part by profit earned by the persons who arrange the shelter. Although the record indicates the existence of a tax shelter market in 1977 for investment quality gems, it also indicates, and we find as a fact, that there was no significant tax shelter or similar alternative market for the sale of gems of as low a quality as those donated by petitioner.[9]

---

[9]Both of respondent's experts testified that the tax shelter market for these types of stones was not very large in 1977. Mr. Rosen specifically stated that in 1977 stones like petitioner's were most commonly traded on the wholesale market. He mentioned tax shelter, barter, or investment markets but indicated these markets opened up subsequent to 1977. Mr. Palmieri testified that a tax shelter market existed in 1977, but he described the types of gems involved in that market as very large or unusual gems, unlike petitioner's low quality stones. He also admitted that he was not exposed in 1977 to any tax shelter sales of

OPINION

The sole issue for decision relates to the amount of the deduction to which petitioners are entitled under section 170 for the contribution of the gems to the Smithsonian Institution.

Section 170(a)(1) allows as a deduction any charitable contribution to an organization described in section 170(c). The parties agree that the Smithsonian Institution qualifies under section 170(c). Section 1.170A-1(c)(1), Income Tax Regs., provides that the amount of a charitable contribution that is made in property other than money shall be the fair market value of the property at the time of the contribution, reduced as provided in section 170(e)(1).[10] Section 1.170A-1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." See *United States v. Cartwright*, 411 U.S. 546 (1973).

At trial, petitioner relied not only on the valuation of the gems by Dr. Joel Arem but also on a valuation by Sarabeth Koethe, Director of the U.S. Gemological Services, Inc., a laboratory specializing in certifying the quality of gems. The individuals who prepared the valuations furnished to petitioner by Wilson did not testify. Respondent had the gems appraised by two independent appraisers, Donald Palmieri and Elly Rosen. All four experts recognized that the gems were generally of a very low quality. However, the aggregate valuations arrived at by respondent's experts were only approximately one-seventh of those arrived at by petitioner's experts. This startling difference is attributable primarily to the disagreement between the parties as to the market and the type of sale which should be assumed in valuing these stones.

Respondent's experts made their valuations on the assump-

amethysts and aquamarines, the types of gems involved here. Furthermore, he testified that the tax shelter market did not become a big business until 1978. Mr. Paul E. Desautels, Curator of the Department of Mineral Sciences, Smithsonian Institution, testified that in 1977 and 1978 there were a lot of people searching to buy gems to be used for tax shelter purposes. He believed, however, that they focused primarily on top quality stones rather than on stones like petitioner's.

[10]Neither party contends that the property donated here is subject to sec. 170(e)(1).

tion that the stones would be marketed in bulk, as parcels or lots. They concluded that there was only a limited market for the bulk sale to jewelry stores of stones like petitioner's since few stores would have had any use for such a large quantity of low quality stones. These experts reasoned that if a store were to buy this quantity and quality of stones from a wholesaler, it would demand a huge discount. Respondent looked to this limited market in valuing the gems, and for this reason, the values he computed were quite low.

Petitioner's experts, on the other hand, started with the assumption that the stones must be valued as if sold individually, rather than in lots or parcels. They selected sales of jewelry containing stones like petitioner's by jewelry, department, or discount stores to individual purchasers as the appropriate market to use for valuation purposes. Their contention is that the retail purchase price of a piece of jewelry containing a stone of the type and quality in question is composed of two elements, the prices of the stone and the setting, respectively. They saw the fair market value of petitioner's gems as that portion of the retail price of a piece of jewelry which represented the value or cost to the purchaser of the stone rather than the setting. Since this apportionment of the sales price of jewelry is nowhere made or reported, the appraisals made by petitioner's witnesses had to be based on estimates only.

The regulations under section 170 are silent on whether the property must be valued on a bulk or an individual basis and what market should be used.

It has been recognized that the test to be used for valuation for estate and gift tax purposes is generally the same as that used for charitable contribution deduction purposes. *United States v. Parker*, 376 F.2d 402, 408 (5th Cir. 1967). Section 20.2031–1(b), Estate Tax Regs., and section 25.2512–1, Gift Tax Regs., both define fair market value in precisely the same terms as section 1.170A–1(c)(2), Income Tax Regs. The Estate and Gift Tax Regulations provide guidance on how the market is selected for valuation purposes. Section 20.2031–1(b), Estate Tax Regs., provides as follows:

Nor is the fair market value of an item of property to be determined by the sale price of the item in a *market* other than that *in which such item is most commonly sold to the public*, taking into account the location of the item

wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) includible in the decedent's gross estate is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile of the decedent would be purchased by a dealer in used automobiles. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. [Emphasis added.]

The provisions of section 25.2512–1, Gift Tax Regs., are almost identical.

These regulations indicate that the value of petitioner's gems was the aggregate price that would have been paid for them when purchased in the market in which such stones are "most commonly sold to the public." In the normal situation, such as the example used in the regulation of a used automobile, the sale "to the public" refers to sale to the retail customer who is the ultimate consumer of the property. We believe this is the appropriate test to use here but must resolve the question of what is the market for sale to the public in the context of this case. We have found as a fact that unset gems of the types and qualities involved here are not sold to individual purchasers. Jewelry and department stores do not sell loose gems; they sell jewelry, a component part of which is frequently gems.[11] The last stage in the chain of distribution at which unset gems like petitioner's are sold is the sale by wholesalers, jobbers, or memorandum houses to jewelry stores of individual stones or small parcels of stones. This is the nearest we have to a sale to the public. We have therefore found as a fact that jewelers, not individual purchasers, at retail, are the ultimate consumers of these stones. Thus, the sale of individual stones to the store is not, in our case, a sale for resale; it is a sale for consumption of the stone. It is this transaction which must be treated as a sale to the public.

---

[11]The testimony indicates that, occasionally, a retail customer will desire to have the merchant set a loose stone, which he or she selects, in a mounting also individually selected. We view this practice as a distinction without a difference since it is a piece of jewelry which is sold to the customer.

*Goldman v. Commissioner*, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966), supports this approach. In valuing a large number of medical journals contributed by an individual who was not a dealer, the court held that the fair market value should be computed "on the price an *ultimate consumer* would pay, and that what might be paid by a dealer buying to resell is not a proper consideration."[12] (Emphasis added.) What this opinion makes clear is that we must look to the consumer sale of the property under consideration. Here, retail jewelers are the ultimate consumers of such unset gems which are consumed in the process of manufacturing items of jewelry. The retail stores are not dealers in unset gems of the types and qualities of petitioner's.

Petitioner's experts focused on the prices at which items of jewelry are sold to customers of jewelry stores, but these are different items of property. For this reason, we do not accept their valuations.

Respondent's experts selected the appropriate stage of the distribution chain to use for valuation purposes, i.e., the sale of unset gems by wholesalers to jewelry stores. The values they arrived at were extremely low, however, because the valuations were made on the assumption that the gems would be sold in parcels or lots, only, and not on an individual stone-by-stone basis, even though they recognized that stones like petitioner's would rarely, if ever, be sold in bulk at this level of the distribution chain.

Respondent has cited no authority,[13] nor have we found any, directly supporting the position that these stones must be valued on a bulk basis simply because they were purchased and donated en masse by petitioner. Respondent claims that language in section 1.170A-1(c)(2), Income Tax Regs.,[14] pro-

---

[12] See also *Alma Piston Co. v. Commissioner*, T.C. Memo. 1976–107, affd. 579 F.2d 1000 (6th Cir. 1978).

[13] The only authority on point that was cited by respondent was his own revenue ruling, Rev. Rul. 80–233, 1980–2 C.B. 69, which dealt with a similar situation. However, respondent's rulings are merely statements of a party's position and are not entitled to any particular weight. *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Estate of Smead v. Commissioner*, 78 T.C. 43, 47 n. 5 (1982); *Estate of Lang v. Commissioner*, 64 T.C. 404, 406–407 (1975), affd. on this point 613 F.2d 770, 776 (9th Cir. 1980).

[14] Sec. 1.170A-(c)(2), Income Tax Regs., provides in pertinent part:

"If the contribution is made in property of a type which the taxpayer sells in the course of

vides indirect support. This regulation requires a taxpayer who sells property in the course of his business to limit his deduction to the price for which the goods he contributes in quantity would sell in the market in which he customarily sells the same quantity of goods. We believe, however, that this provision has no relevance to the case before us. Petitioner was not a dealer in gems, so the provision does not apply to him. We see no reason to apply the regulation by analogy since it was obviously designed to deal only with the specific problem of taxpayers who donate property that they customarily hold for sale to customers.

We believe the best guide to use in determining whether to look to bulk or individual sales for valuation purposes is section 20.2031-1(b), Estate Tax Regs., and section 25.2512–1, Gift Tax Regs. These regulations indicate that a separate fair market value should be determined for each *unit* of property. The record in this case shows that individual stones are frequently sold by memorandum houses and sometimes by wholesalers to jewelry stores and other purchasers, which undermines respondent's contention that the stones could only be sold on a bulk basis. We believe that each individual stone is a separate unit of property for valuation purposes. Thus, the valuations made by respondent's experts are unacceptable because they were based on the erroneous assumption that the gems had to be valued on a bulk sale basis.[15]

What we have in this case are two sets of valuations, each of which is based upon a substantially incorrect view of how the property at issue should be valued. In some cases in which experts' valuations are based on incorrect assumptions, it may be possible for the Court to construct reliable estimates of fair

---

his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers."

[15]In *Estate of Smith v. Commissioner*, 57 T.C. 650 (1972), affd. on other issues 510 F.2d 479 (2d Cir. 1975), the Court recognized that the simultaneous marketing of a large number of sculptures would necessarily depress the market for each particular sculpture. See also *Jarre v. Commissioner*, 64 T.C. 183, 189–190 (1975). Here, in contrast, the simultaneous sale of all petitioner's stones would have had no substantial effect on the market value of each stone since the number of stones held by petitioner was but an insignificant portion of the number of low quality colored stones sold each year in the United States.

market value by adjusting for the discredited assumptions. However, this is not such a case.

The testimony of petitioner's experts shows there is no reliable way of working back from the figures they computed as the gems' fair market values when sold in jewelry at retail stores to arrive at the unset gems' fair market values at the wholesale level. When asked by the Court whether he could convert his retail prices into wholesale prices, Dr. Arem was reluctant to do so. He declared that there was really no one price for a given item that could be called representative wholesale and that there is no particular level of the wholesale market that sets the price for retailers. He explained that the range of prices at wholesale is in hundreds of percent, with the markups on lower quality stones generally being the highest. It was his view that reliable valuations of particular gems could be made only by actually familiarizing oneself with the wholesale sales price of comparable stones at the particular time. Yet this was not done in this case by Dr. Arem.

Ms. Koethe was a bit more optimistic about her ability to compute the December 1977 wholesale prices of stones like petitioner's. At trial, she estimated the wholesale values of two of petitioner's parcels of amethysts and one parcel containing a single aquamarine. The markups she used in the estimates were approximately 150 percent for the amethysts and 100 percent for the aquamarine. Yet she also testified that the average markup on colored stones was 150 percent but that smaller, lower quality stones are marked up three, four, or five times. Petitioner's stones were in general of a very low quality, so it could be inferred that the increment of the retail jewelry sales price for such stones might be on the average hundreds of percent over wholesale cost. Indeed, Ms. Koethe admitted that some of the amethysts would have a value at retail of four or five times the wholesale price. In view of this aspect of her testimony, we find her in-court estimates to be entitled to little weight. We note, too, that she had little personal experience in the wholesale or retail stone markets but relied only on pricing information furnished by others.

It is also impossible to work from respondent's experts' valuations to arrive at the prices for which the stones would have individually sold at wholesale. Both respondent's experts were adamant that the marketability of the gems was severely

affected by the large size of the parcels, but they gave no indication how great the effect was in terms of dollars or percentages. The sales referred to by respondent's experts as comparable do not give us an effective gauge of the gems' fair market values because they were sales of large parcels rather than individual stones.

Respondent's determination in the notice of deficiency is presumptively correct. Under Rule 142(a), Tax Court Rules of Practice and Procedure, petitioner has the burden of proving that the valuation should be higher than that stated in the notice of deficiency. Because it involves an increased deficiency, respondent has the burden of proving a lower valuation.[16] With all the experts' valuations fatally defective and there being no way to use these valuations to arrive at a correct estimation of value, we conclude that petitioner has not carried his burden of proving that the value used in the statutory notice is incorrect and of establishing the correct fair market value. Similarly, respondent has not carried his burden of establishing an increased deficiency based upon an aggregate value lower than that used in the statutory notice. Accordingly, we hold that the fair market value of the stones donated by petitioner to the Smithsonian Institution in December 1977 was $16,800, as determined in the notice of deficiency.

*Decision will be entered under Rule 155.*

---

[16]See *Reiff v. Commissioner*, 77 T.C. 1169, 1173 (1981).