CHARLES D. WILLIAMS AND DESTINY D. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Commissioner
Docket No. 10419-85.
United States Tax Court
T.C. Memo 1988-6; 1988 Tax Ct. Memo LEXIS 6; 54 T.C.M. (CCH) 1471; T.C.M. (RIA) 88006; January 5, 1988; As amended January 5, 1988 Carrold E. Ray, for the petitioners. Nancy W. Hale, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency in petitioners' 1980 Federal income tax return in the amount of $ 30,786.00. We must determine (1) the fair market value of *7 217 Caddo Indian artifacts donated to the Museum of Red River on December 12, 1980, and (2) whether the donation was a tax motivated transaction within the meaning of section 6621(c). [1]
Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners, Dr. Charles D. Williams and his wife Destiny D. Williams, resided in Little Rock, Ark., when they filed their petition in this case. Dr. Williams (hereinafter "petitioner") is a thoracic surgeon. On October 31, 1979, petitioner purchased a collection of Caddo Indian artifacts from his friend Dr. Kent Westbrook. [2] Petitioner donated these artifacts ("Williams' collection") to the Museum of Red River located in Idabel, *8 Okla., in 1980. A majority of the donated artifacts came primarily from a Caddo Indian burial site known as Mineral Springs, Ark.[3] Mineral Springs is one of several Caddo Indian sites located in the region where Arkansas, Louisiana, Texas and Oklahoma meet. There were four excavations of the Mineral Springs site prior to the one yielding the artifacts purchased by petitioner. The first excavation was conducted by M. R. Harrington in the early 1990's. Harrington's work at Mineral Springs was published as a chapter in Indian Notes and Monograph: Certain Caddo Sites in Arkansas. Clarence Webb conducted the second excavation *9 at Mineral Springs in the 1950's. His work was published by the Society for American Archeology. The third excavation was by Charles Bohannon for the National Park Service. Bohannon's work, Excavations at the Mineral Springs Site, was published by Arkansas Archeological Survey. The fourth excavation was not documented but was conducted by Glenn Kizzia in the early 1960's. The Caddo artifacts purchased by petitioner were excavated by Joe Shurtleff and Cleatious Thomas in 1963 and 1964. Shurtleff and Thomas were amateur archeologists, but kept fairly extensive records of their dig. The information and artifacts discovered by Shurtleff and Thomas were used by Michael P. Hoffman in preparing his doctoral thesis, "A Partial Archeological Sequence for Little River Region, Arkansas." The Shurtleff-Thomas excavation yielded 236 ceramic pots, 9 effigy pots, 17 pipes, 1 effigy pipe, 3 celts, 1 stone blade, 1 shell, a number of quartz crystals, 123 arrow points or flints and 2 ear spools. Shurtleff bought Thomas' interest in the artifacts for $ 350 shortly after completing the dig in 1964 and stored them primarily in his basement and/or garage until 1979. Sometime in 1979, Sam *10 Johnson, an expert in Caddo artifacts, went to Shurtleff's home to look at his artifacts. Shurtleff did not contact Johnson or ask him to appraise the artifacts. Johnson assigned a price for each object in Shurtleff's collection, and advised Shurtleff that his entire collection was worth between $ 25,000 and $ 20,000. Shurtleff's collection consisted of many items from cemetery 3 at Mineral Springs as well as artifacts from many other sites. [4]
A short time thereafter, in September 1979 Dr. Kent Westbrook, who was a business associate and personal friend of Sam Johnson, [5] offered to buy almost all the artifacts in the Mineral Springs collection plus approximately 150 other artifacts from Shurtleff. Westbrook persuaded Shurtleff to sell the approximately 400 artifacts for $ 25,000. [6]
*11 Westbrook had purchased the entire collection in order to obtain four pieces. The pieces he was interested in acquiring were an effigy of an alligator gar, an effigy of a fish, an effigy of a turtle and a Haley bottle. These four objects were of outstanding quality. In fact, Westbrook considered the effigy of the alligator gar to be the finest Caddoan artifact discovered. All four of these items were retained by Dr. Westbrook and were included in his Legacy in Clay: Prehistoric Ceramic Art of Arkansas. The value of the four pieces was believed to be $ 20,000 to $ 25,000. Westbrook decided to sell a majority of the collection. However, Westbrook had promised Shurtleff he would do his best to keep the Mineral Springs artifacts together in order to maintain their archeological significance. Westbrook sold the Haley site artifacts to one person and most of the Mineral Springs artifacts to petitioner. Westbrook had Johnson appraise the pieces which petitioner eventually purchased. Johnson appraised the collection at $ 65,000 to $ 70,000. The appraisal did not include the four pieces which Westbrook retained and which were the most valuable pieces in the collection. Westbrook *12 would not sell the collection to Johnson [7] because of the agreement he had with Joe Shurtleff to keep the collection together. Johnson was compensated for the appraisal with 20 arrowheads valued at approximately $ 100. Petitioner had never before purchased Caddo artifacts. He knew nothing about the Caddo culture or their ceramic artwork except for what Westbrook told him or what he read at Westbrook's suggestion. He completely relied upon Westbrook's knowledge and expertise in purchasing the collection. Petitioner did not purchase the collection for his personal use of edification. He never removed the pottery from Westbrook's home. Moreover, two weeks after he purchased the artifacts, on November 16, 1979, petitioner loaned the collection to the Museum of Red River, but was unaware of how the collection was transported. Thirteen months later, on December 12, 1980, petitioner donated the collection to the Museum of Red River. The artifacts have been in storage at the Museum of Red River *13 since November 16, 1979. Petitioner was generally unaware of any details involving the purchase, appraisal, and donation of the artifacts. He did not remember whether he had been told that certain pieces were removed from the collection before purchasing it, nor did he recall having any specific understanding as to the value of the artifacts at the time he purchased them. Petitioner did not remember receiving any appraisals before he purchased the artifacts and he did not contact anyone to appraise the artifacts. Petitioner was advised by Westbrook and his own tax advisors to donate the artifacts to the Museum of Red River. He retained six to eight Caddo pots for himself and all of the flint pieces. Otherwise, he donated 192 ceramic pots, 2 effigy pots, 16 pipes and 7 stone implements. There were no field notes, excavation diagrams, or other documentation provided or donated to the Museum. Scientific value of an artifact can serve to increase its commercial value. The Shurtleff-Thomas excavation had scientific value because the excavation occurred at a fairly well known Caddo site and the particular dig discovering the artifacts in question was fairly well recorded. The *14 existence of records of an excavation is important in the study of a prior civilization. Another factor in determining the scientific value of a collection is the completeness of that collection. Several of the artifacts originally excavated at Mineral Springs by Shurtleff and Thomas were not donated to the Museum of Red River. For example, in his doctoral dissertation Hoffman only saw 178 of the pots dug. Moreover, 24 of the pots on which Hoffman commented were not included in the Williams donation; Westbrook retained four of the finest pieces and petitioner retained all of the flints and six to eight pots. Similarly, the whereabouts of the quartz materials and projectile points from the Shurtleff-Thomas excavation, which are important in confirming, expanding or contradicting evidence obtained from pottery in relating it to a particular phase of a culture, are unknown and have not been donated to the Museum in Red River. The condition of the artifact does not necessarily affect the scientific value of a collection. Westbrook and petitioner, however, retained the pieces which were in the best artistic and aesthetically pleasing condition. Only 22 of the pots petitioner donated *15 were either complete or nearly complete. The remainder were missing anywhere from one percent to 50 percent of their original substance or were in shards. While the condition of the pot may not alter the scientific value of an artifact, it is one important factor in determining the commercial or artistic value of an Indian artifact. It is not unusual for a pot to be restored before it is sold to a customer. [8] A restored pot is usually worth 50-60 percent of the value of a whole pot. Of the 217 artifacts donated, approximately one half of the artifacts were missing 10 percent of their total substance and at least 40 of the pots were missing 20 percent of their substance. None of the donated artifacts were professionally restored. On their 1980 Federal income tax return, petitioners claimed a deduction for a charitable contribution in the amount of $ 85,441.00. Respondent determined the value of the contribution to be $ 20,840.00 and disallowed the deduction to the extent it exceeded the redetermined amount. Petitioner's evaluation was done by Sam Johnson. Sam Johnson received his college degree in personnel management. *16 However, even though not schooled in appraisals, Johnson has extensive experience dealing with Indian artifacts. More specifically, he has great experience in Caddo Indian art. He is the owner of the Caddo Trading Company and also operates an archeological site and museum called the Kadoha Indian Village in Murfreesboro, Arkansas. Johnson classified each item individually in preparing his appraisal. He considered the type of artifact, comparable sales, the excavation method and significance in the Caddoan culture to arrive at a value. Johnson then added to the value because he believed all of the artifacts came from the same, well documented location, cemetery 3 at Mineral Springs. Johnson has experience in selling both expensive and inexpensive Indian art. For example, some invoices from the Caddo Trading Company show items priced in the thousands of dollars. [9] Conversely, Johnson also publishes a catalogue advertising the artifacts he has for sale. Almost every Caddo artifact listed between 1982 and 1985 was priced well under $ 1,000. *17 Respondent's evaluation was conducted by Laurence Tyler. Tyler has been a dealer of American Indian Art for over 20 years. He has a degree in Anthropology from the University of Washington as well as two years of post graduate work. He has also been appraising Indian artifacts for over 20 years. Prior to appraising the Williams' collection Tyler had only purchased a few Caddoan artifacts. To compensate for his lack of expertise to this particular Indian culture Tyler reviewed the site reports for the Mineral Springs site and two other Caddoan sites. He also visited the Caddo artifact display at the University of Arkansas. Tyler did not classify each item in the William's collection individually. Respondent provided Tyler a list of the artifacts. [10] Tyler spot-checked some of the classifications for accuracy. Since they were fairly accurate he did not reclassify the items. Tyler did, however, indicate in his appraisal how much of the original substance of an artifact was missing. He considered comparable sales, aesthetic quality, authenticity, the condition of each artifact and the fact that the artifacts came from a known site in appraising the collection. *18 At the time he appraised the Williams' collection, Tyler purchased a few Caddoan artifacts from Cleatious Thomas. Mrs. Herron, of the Museum in Red River, suggested he buy Caddoan artifacts from Cleatious Thomas. [11] From his visit with and purchase from Thomas, Tyler was able to confirm his understanding of the price structure of Caddoan artifacts. Tyler also discussed the price structure of Caddoan ceramics with Ralph Olson, a noted collector-dealer of Central State artifacts and Ramona Morris, a dealer in Caddoan artifacts from Shawnee Mission, Kansas. As a result of the discussions, Tyler revised some of his preliminary evaluations before he submitted his appraisal report. OPINION Section 170(a) allows a taxpayer a deduction for charitable contributions made during the taxable year. When a taxpayer contributes property, as in this case, the amount of the allowable deduction is the fair market value of the property at the time of the donation. Section 1.170A-1(c), Income Tax Regs. *19 The generally accepted definition of fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. Fair market value as of any given date is a question of fact to be determined by considering all relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Petitioners must prove that the value of the contribution is greater than the fair market value as determined by respondent. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner donated 217 Caddo Indian artifacts to the Museum in Red River in Idabel, Okla., on December 12, 1980. He is thus entitled to a deduction equal to the fair market value of the artifacts on the date of the donation. Petitioner claimed a charitable contribution deduction for the 1980 taxable year in the amount of $ 85,441.00. Respondent has disallowed the deduction to the extent it exceeds $ 20,840.00. Petitioner claims the deduction based upon the appraisal *20 done by Sam Johnson. Johnson is an expert in Caddo Indian artifacts and has extensive experience in trading and selling of the types of artifacts petitioner donated to the Museum in Red River. Johnson is not, however, an entirely disinterested and independent appraiser. Several factors cast doubt on the accuracy of Johnson's appraisal. Johnson has had a close association with Kent Westbrook for many years and Westbrook has been close friends with petitioner since high school. Johnson and Westbrook are both business and social acquaintances. Johnson and Westbrook also both have had a long association with the Museum in Red River. The most telling factor to be considered, however, is the apparent role Johnson played in the acquisition of the artifacts from Shurtleff. Johnson has appraised the artifacts in question on three separate occasions. First, he went uninvited to Joe Shurtleff's home, and appraised the pieces in question as well as hundreds of other pieces. He told Shurtleff his entire collection was worth between $ 15,000 and $ 20,000. This was done by assigning a value to each piece separately. A short time later Westbrook, who was interested particularly in four *21 pieces of the collection, went to Shurtleff's home and offered to buy the artifacts in issue here plus approximately another 150 pieces for $ 25,000. Joe Shurtleff reluctantly sold the collection to Westbrook. Within a few weeks, Westbrook turned around and sold approximately 250 pieces to petitioner -- his long-time friend. The pieces petitioner purchased came primarily from the Mineral Springs site. Petitioner paid $ 20,000 for the collection which no longer contained the four best pieces -- alone valued at approximately $ 20,000. Immediately, after petitioner agreed to purchase the collection Johnson appraised the pieces petitioner ultimately bought for $ 65,000-$ 70,000. Finally, Johnson appraised the collection in 1980 at $ 85,441 which is the basis of petitioner's claimed deduction. Petitioner would have us believe that the purchase of the collection for $ 25,000 by Westbrook was a bargain and that Westbrook passed that bargain on to his long time friend. While the evidence convinces us that Westbrook got a bargain for the over 400 pieces he purchased, we are not persuaded that the bargain was passed on to petitioner. Clearly, if the four pieces retained by Westbrook *22 were worth $ 20,000 and if the collection donated by petitioner was worth at a minimum $ 20,000, then Westbrook made a good deal when he purchased all of the pieces for $ 25,000. However, Johnson's second appraisal standing alone does not convince us that the real value of the pieces when petitioner purchased them was $ 70,000, and, that after petitioner removed all of the flints and six to eight pots, the value of the collection increased in 13 months to $ 85,441.00. In addition to all of the factors which cast doubt upon the integrity of Johnson's appraisal, the price guides published by Johnson for items in his Caddo Trading Company are not comparable to the values assigned the pieces in Williams' collection. The average price of a Caddoan artifact in the 1982-1985 price guides published by Johnson was between $ 150 and $ 175; whereas, the average price of a pot in the Williams' collection was approximately $ 390. Certainly, the fact that the pieces in the Williams' collection came from a fairly well known and well documented excavation site contribute to their value. However, almost every pot offered for sale in the price guide was in good condition or had been restored. The *23 pieces in the Williams' collection were not professionally restored and more than half of all of the pots contributed were missing at least 10 percent of their original substance. Respondent's expert valued the artifacts at $ 20,840.00 on the date of contribution. This appraisal exceeds the value of the original purchase price ($ 20,000). Not only is the price slightly increased from the date of donation, but petitioner also removed six to eight pots and all of the flints. While respondent's appraiser is an expert in Indian art, he has little or no experience in trading Caddo Indian artifacts, nor is he familiar with the Caddoan Indian history or culture which could ultimately affect the accuracy of his appraisal. In order to compensate for his lack of particularized expertise, Mr. Tyler conferred with persons who were familiar with Caddo Indian culture and art, notably Mrs. Herron of the Museum in Red River, Mr. Pegrino, director of the Museum in Red River in 1980, Ralph Olson and Ramona Morris, two known dealers of Caddoan Artifacts and Cleatious Thomas who excavated and traded artifacts in Arkansas. Appraisers can often disagree on the fair market value of art. See Anselmo v. Commissioner,80 T.C. 872 (1983), *24 affd. 757 F.2d 1208 (11th Cir. 1983). The disparity between the Johnson appraisal and the Tyler appraisal was great. The differences became greater as the condition of the artifacts declined. For example, Johnson's average value of a complete or nearly complete pot was $ 379 and Tyler's average was $ 255, whereas, Johnson's average for pots missing approximately 25 percent of their original substance was $ 379 and Tyler's average was $ 34.50. Thus, it is evident that Johnson gave little or no weight to the condition of the pot. While petitioner has convinced us that independent scientific value may serve to increase the commercial value of some artifacts, we cannot determine an increase in value in the case before us. Petitioner put forth much evidence about the archeological significance of the Mineral Springs site and the importance of documentation. In this case the original documentation was not donated with the artifacts. Apparently, the documents are still in Joe Shurtleff's possession. Additionaly, while Michael Hoffman's thesis may serve to increase the scientific value of the collection and perhaps, therefore, the fair market value of the collection, *25 the fact that the collection is incomplete and that the best pieces have been removed negates any potential increase. Although opinion evidence is admissible and relevant to the question of value, we must weigh such evidence in light of the demonstrated qualifications of the experts and all relevant evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. Furthermore, we are not bound by an expert witness' opinion that is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1953). Since Johnson was not an independent appraiser, and because of the conveniently-timed large fluctuations in appraised values he assigned the donated artifacts, we give no weight to Johnson's appraisal of the Williams' collection. Petitioner has failed to meet his burden of proof. See Anselmo v. Commissioner,80 T.C. 872, 886 (1983), *26 affd. 757 F.2d 1208 (11th Cir. 1983). Petitioner has also failed to persuade us that respondent's expert is not qualified to appraise the collection. We received no convincing evidence to suggest valuation procedures for the Caddo Indian artifacts should differ from valuation procedures used in appraising other Indian artifacts. Moreover, since Tyler confirmed his beliefs about price structure of Caddoan Indian artifacts with dealers of Caddoan artifacts, we find his appraisal to more accurately reflect the actual value of the donated artifacts. Therefore, we adopt respondent's appraisal of $ 20,840. Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 451-452 (1980). Petitioners' overvaluation of their contribution to the Museum in Red River resulted in a "substantial underpayment" (an underpayment in excess of $ 1,000) during the 1980 taxable year. If the underpayment is "attributable to 1 or more tax motivated transactions," then petitioner is subject to an addition to tax in the form of an increased interest rate due on the underpayment. Sec. *27 6621(c). The addition applies to interest accruing after December 31, 1984. Sec. 144(c), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 682; Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent raised the addition to tax due to a tax motivated transaction in his answer and therefore bears the burden of proof on this issue. Rule 142(a). A tax motivated transaction includes "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(c)(3)(A)(i). A valuation overstatement, as defined in pertinent part by sec. 6659(c), exists if "the value of any property * * * claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation". In this case, petitioner's valuation exceed the redetermined amount by more than 150 percent. Petitioner claims that, since respondent bears the burden of proof on this issue, before the addition to tax may be imposed respondent must also show that petitioner lacked good faith and could *28 not have reasonably relied upon his expert's appraisal. We disagree. The addition to tax imposed by section 6621(c) applies to "any valuation overstatement (within the meaning of sec. 6659(c))." (Emphasis added.) There is no language restricting the scope of this addition to tax to those cases where there is no reasonable reliance on the valuation and a lack of good faith. Had Congress intended to so limit the scope of 6621(c), it could have indicated its intent within the language of the statute. For example, in sec. 6659(e), Congress gave the Secretary the discretion to waive additions to tax for overvaluation statements when the taxpayer shows a reasonable basis for the valuation and that the claim was made in good faith. In fact, the specific reference to sec. 6659(c) within section 6621(c) without a reference to section 6659(e) is further evidence of Congress' intention not to limit the scope of the addition to tax for tax motivated transactions under 6621(c)(3)(A)(i). The record convinces us that the purchase and donation of these Caddo Indian artifacts was a tax motivated transaction *29 within the meaning of section 6621(c). To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as applicable to the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Subsection (d) of 6621 was redesignated as subsection (c) and amended by sec. 1511(c)(1)(A)-(C), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. ↩
2. Petitioner, and Dr. Westbrook have been friends since high school. They attended both college and medical school together and they lived on the same street in 1979, 1980 and at the time of trial. ↩
3. The artifacts were dug from what has been designated by the excavators as 11-C1. The 11 refers to the Shurtleff-Thomas site number and the C1 indicates cemetery 1 at the site. Subsequently, Michael Hoffman used the excavation notes to prepare his doctoral thesis. Dr. Hoffman redesignated the site as cemetery 3. We refer to the site as cemetery 3. ↩
4. Shurtleff had artifacts from six to twelve different archeological sites. ↩
5. Johnson and Westbrook have known each other since the early 1970's. During that time their relationship was primarily one of collector-client. Their relationship and association has increased over the years to the extent that they are both involved in several of the same oil and gas ventures and Westbrook is part owner of some companies Johnson is involved in. ↩
6. Westbrook claims he paid $ 25,000 for the collection, however, only $ 12,000 worth of cancelled checks from Westbrook's "special account" were admitted into evidence. Mr. Shurtleff remembers the purchase price to be more than $ 20,000. ↩
7. Johnson did not make a specific offer at the time he sought to purchase the collection from Westbrook. He did testify that he probably would have paid between $ 20,000 and $ 50,000. ↩
8. Sam Johnson has the artifacts he sells restored. ↩
9. Respondent objected to the relevance of these invoices at trial. We find, however, that the invoices are relevant to determining the scope of Johnson's expertise and also indicate the varied quality of artifacts which he has personally traded. ↩
10. The list was actually the classifications prepared by Sam Johnson. ↩
11. At the time of the purchase Tyler was unaware that Thomas was an excavator of the Williams' collection. ↩