LEO J. MALONE, JR. and SHARON M. MALONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Malone v. Commissioner
Docket No. 42177-85.
United States Tax Court
T.C. Memo 1987-300; 1987 Tax Ct. Memo LEXIS 300; 53 T.C.M. (CCH) 1144; T.C.M. (RIA) 87300; June 16, 1987. Paul P. Weil and Juan D. Keller, for the petitioners. Douglas W. Hinds, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
Sec. 6659
1980
$12,855.60
$4,141.92
$2,233.73
1981
8,887.25
2,666.18
Respondent determined that part of the underpayment of taxes for 1980 and all of the underpayment for 1981 are subject to interest at a rate determined under section 6621(d). [2]
*302 After concessions, [3] the issues that we must decide are: 1. Whether petitioners are entitled to charitable contribution deductions in 1980 and 1981 in excess of $4,721.55 and $5,535.00, respectively, for their donations of four items to the Smithsonian Institution (the "Smithsonian"). 2. Whether petitioners are liable for the addition to tax under section 6653(a) for 1980. 3. Whether petitioners are liable for the addition to tax under section 6659 for 1981. 4. Whether petitioners are subject to interest at a rate determined under section 6621(c) on parts of their underpayments for both 1980 and 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners were residents of St. Louis, Missouri, when they filed their petition herein. They timely filed joint Federal income tax returns for both 1980 and 1981. The *303 deficiencies determined by respondent are attributable mainly to the charitable contribution deductions petitioners claimed for their donations of gemstones, minerals, and jewelry to the Smithsonian in 1980 and 1981. [4] Petitioners had purchased all of the items from Gary R. Hansen of St. Louis, Missouri. 1980 Donations
Petitioners' 1980 donations consist of three items: A specimen of rubellite tourmaline on quartz (the "rubellite tourmaline"), a mineral collection, and a yellowish-green tourmaline. Petitioners purchased the items in 1977, 1978, and 1975, respectively, for a total of $5,657. [5] They donated the three items to the Smithsonian in December of 1980 and claimed a $27,500 charitable contribution on their 1980 return for the donation. [6] They deducted the entire contribution from their 1980 income. *304 1981 Donations
Petitioners' 1981 donations consist of two items of jewelry: A gold pendant with a greenish-yellow beryl and four diamonds; and a gold ring with a tourmaline and 24 diamonds. Petitioners purchased the two items on September 12, 1980 for a total of $4,600. [7] They donated the two items to the Smithsonian on December 14, 1981 and claimed a $21,028 charitable contribution on their 1981 return for the donation. [8] They deducted the entire contribution from their 1981 income. Respondent's Audit
Respondent audited petitioners' returns and determined that the fair market values of the three items donated in 1980 totaled $3,771.33 rather than the $27,500 shown on the 1980 return, and that the fair market values of the two items donated in 1981 totaled $3,066.66 rather than the $21,028 shown on the 1981 return. Respondent determined that the underpayment for 1980 was subject to the addition to tax provided by section 6653(a), and that the underpayment for 1981 was subject to the addition to tax provided by section *305 6659. Respondent determined that portions of petitioners' underpayments for both years at issue were subject to interest at the rate provided by section 6621(c). [9]
The parties stipulated at trial that the fair market value of the mineral collection donated in 1980 totaled $485. The fair market values of the remaining two items donated in 1980 and the two items donated in 1981 remain in dispute. We find that the underpayment resulting from petitioners' overstatement of the value of their charitable contributions was greater than $1,000 in both 1980 and 1981. OPINION Charitable Deductions
The first issues for our decision are the proper charitable deductions allowable for the two tourmalines donated in 1980 and the two pieces of jewelry donated in 1981. Petitioners are entitled to claim as a charitable contribution the fair market values of the items, as of the dates they contributed them to the Smithsonian, in accordance with section 170. Sec. 1.170A-1(e)(1), Income Tax Regs. Fair market value is the price *306 at which the items would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value may be determined based upon the price at which the items would have changed hands in the markets in which they would have been sold most commonly to persons who ultimately use them. Anselmo v. Commissioner,80 T.C. 872, 881-882 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Fair market value is a question of fact to be determined by an examination of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985). In the present case expert witnesses testified on behalf of both petitioners and respondent. Both parties have now conceded that their original valuations were too extreme. Petitioners now contend that the proper fair market values are those given by their expert: $22,295 for the two tourmalines donated in 1980, and $17,564 for the two pieces of jewelry donated in 1981. Respondent now contends that the proper fair market values are those given by his experts: $4,721.55 *307 for the two tourmalines donated in 1980 and $5,535 for the two pieces of jewelry donated in 1981.[10] The opinions of experts are admissible and relevant to the issue of value, but the opinions must be weighed in light of each expert's qualifications and all other relevant evidence of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). The Experts
Petitioners rely on appraisals performed by David B. Michaels to establish that the fair market values of *308 the tourmalines and jewelry exceeded the amounts determined by respondent. [11] Michaels is a professor of Business Management at a community college in Northern Virginia. He devotes 25 to 30 percent of his time to gem appraisal. He has only been involved incidentally in the purchase and sale of gemstones, minerals, and jewelry. He has never been in the business of purchasing and selling gemstones, minerals, or jewelry. He has never worked in either the wholesale or retail side of the jewelry business. He did not begin rendering appraisals until 1982. Michaels' principal expertise is in evaluating the quality of gemstones rather than their dollar value. [12] Due to his lack of personal knowledge of the market prices that prevailed in 1980 and 1981, he was forced to estimate market prices based on his review of price lists and retail catalogs, and by discussions with dealers. Respondent relies on appraisals performed by Elly Rosen and Eric Freedman to support his *309 determination of the fair market values of the items. Rosen is an independent appraiser of gems and has extensive experience evaluating, appraising, buying, and selling gemstones. [13] During 1980 and 1981, he was actively engaged in purchasing, selling, and appraising gemstones and jewelry. He is familiar with the accepted principles and procedures used by professional appraisers, and has lectured and published regarding the principles of jewelry appraisal. Freedman also served as an expert for respondent. He is the president of B. Freedman Jewelers, Inc. of Huntington Village, New York, is an instructor of Appraisal Studies at C.W. Post College, and is the director of one of the only two accredited gem testing laboratories in the New York City metropolitan area. He bought and sold gemstones during 1980 and 1981. The Appraisals
Rubellite Tourmaline
Michaels admitted that he had never seen a specimen like the rubellite tourmaline. He acknowledged, however, that similar specimens are available at mineral shows. As he had never personally *310 seen a similar specimen, he was forced to value the tourmaline based on estimates of value he solicited from mineralogists and collectors. The mineralogists and collectors were not able to actually view the rubellite tourmaline, but were instead asked to value it after viewing a photograph. The mineralogists and collectors gave estimates of value that Michaels described as "all over the place." He nevertheless concluded that the consensus "seemed to be in the neighborhood of $10,000 to $15,000," and valued the rubellite tourmaline at $15,000. Freedman also appraised the value of the rubellite tourmaline. He appraised the rubellite tourmaline by examining it, measuring it, and valuing it based on his experience in the market in which, in his opinion, it would have been sold most commonly to an ultimate user during 1980. He identified that market as the collector's market. He stated that the specimen was not unique, was not a gem, and was useful only for educational purposes. In his opinion the value of the specimen remained stable between when it was purchased by petitioners in 1977 and when it was donated by them to the Smithsonian in 1980. He stated that specimens of this *311 type were a novelty on the market in 1977 and that they gradually lost their novelty premium as more came on the market. He explained that inflation offset the loss of novelty premium. He stated that he saw and could have purchased a much nicer example of the same type of specimen for $4,000 in February 1986. He concluded that the rubellite tourmaline had a fair market value of $2,600 as of December 1980. Yellowish-green tourmaline
Michaels valued the loose yellowish-green tourmaline by seeking out sales of finished jewelry containing similar stones. He found jewelry containing what he determined to be similar quality stones advertised in the 1983 and 1984 catalogs of W. Bell & Company ("Bell"), a catalog showroom. [14] He determined the value of the stones in that jewelry by subtracting from the total cost of the jewelry his estimate of the cost of the components other than the stones. The amount remaining after subtracting the cost of the other components was his estimate of the value of the stone. *312 Rosen and Freedman also appraised the loose yellowish-green tourmaline. Rosen examined it, authenticated it as a tourmaline, graded its quality, [15] and then appraised its value based on his knowledge of the prices similar tourmalines traded for in the market in which, in his opinion, it would have been sold most commonly to an ultimate user during 1980. Rosen identified that market as the market in which the tourmaline would be sold to a jeweler for use in jewelry. Rosen observed two flaws in the stone. Rosen stated that the stone had been improperly cut to leave on unnecessary weight and that the stone was yellowish-green rather than pure green. He concluded that it had a fair market value of $1,857.10 on December 30, 1980. Freedman appraised the yellowish-green tourmaline by measuring it and evaluating its quality. He then valued it based on his knowledge of the prices similar tourmalines traded for in the market in which, in his opinion, it would have been sold most commonly to an ultimate user during 1980. Freedman agreed with Rosen that the appropriate market was the one in which the tourmaline would be sold *313 to a jeweler for use in jewelry. Freedman also agreed with Rosen that the stone had been cut to leave on unnecessary weight. He concluded that the tourmaline was unexceptional and very commonly available, and he valued it at $2,386 as of December 1980. Pendant and Ring
Each of the three experts valued both the pendant and the ring. Each of the three agreed that the appropriate market in which to determine their values was the market in which a retail jeweler would be selling to a customer. Michaels appraised the pendant and ring by estimating what it would cost to reconstruct them. He identified the components of the pendant as a 61.92 carat greenish-yellow beryl set in an 18-carat gold basket containing four single cut 0.04-carat round diamonds. He valued the gold basket by estimating the value of a 14-carat basket and increasing it to approximate the value of an 18-carat basket. He estimated the value of the four diamonds to be about $114, and estimated the labor necessary to assemble the pendant to be $120. He estimated that the total value of the mounting for the stone, including the diamonds, was $1,029. Michaels estimated the value of the greenish-yellow beryl *314 at $126 per carat based on a price list and discussions with a jeweler. Michaels identified the components of the ring as a 17.75-carat chrome-green tourmaline surrounded by 24 round brilliant cut 0.04-carat diamonds set in an 18-carat gold setting. He estimated that the total value of the setting and labor was $2,085. Michaels based his valuation of the tourmaline contained in the ring on his estimate of the price of a tourmaline contained in a ring in a 1984 Bell Catalog. He estimated the price of the tourmaline in the catalog at $384 per carat by subtracting from the price of the ring his estimate of the prices of the ring's other components. He determined that the stone was being retailed for three times its wholesale price and therefore divided the $384 per carat retail price by three to arrive at a $128 per carat wholesale price. He reduced the $128 per carat wholesale price by 25 percent, to $96 per carat, to approximate 1980 prices. [16] He used a $375 per carat value in his appraisal of the tourmaline contained in the ring at issue. [1]7 *315 Rosen appraised the values of the pendant and ring by thoroughly examining them and valuing them based on his experience in the jewelry business. He examined, tested, and graded the jewelry in his office in Brooklyn, New York. He graded the color, brilliance, extinction, zoning, clarity, proportion, symmetry, and polish of the gemstones contained in the jewelry. He determined that the pendant and ring had retail values as of December 18, 1981 of $2,000 and $2,750, respectively. Freedman also appraised the values of the pendant and ring. He examined and evaluated both items in his laboratory in Huntington, New York. He evaluated the color, clarity, size, and weight of the gemstones contained in them. He stated that both items are common items of jewelry. Based on his experience as a retail jewelry dealer, he determined the retail values of the pendant and ring to be $2,608 and $3,712, respectively, as of December 1981. We were impressed with the experience and credentials of Rosen and Freedman. They both had extensive experience buying and selling the items they appraised. Both were involved in the gem business full-time during 1980 and 1981. Their appraisals were well reasoned *316 and support the values advanced by respondent. We were unimpressed with the experience and credentials of Michaels. The record revealed the shallowness of his knowledge of the gem market -- particularly with regard to appraising the dollar value of gems as opposed to evaluating their quality. Michaels admitted that he had never been in the business of purchasing and selling gemstones, minerals, and jewelry, and has been involved only incidentally in their purchase and sale. We have serious doubts that he appraised the fair market values of the items accurately. Michaels displayed little knowledge of the market for the rubellite tourmaline. He appraised it based on estimates of value given by persons who had never seen it. He described the values as being "all over the place." He concluded that the consensus "seemed to be in the neighborhood of $10,000 to $15,000." We have no confidence that Michaels' $15,000 valuation of the rubellite tourmaline approximated its fair market value. In contrast, the record evidences that Freedman had extensive experience in the market in which the rubellite tourmaline was most commonly sold to persons who ultimately used similar specimens. Freedman *317 had been offered a superior example of the same type of specimen for $4,000 in February 1986. We are confident that his $2,600 appraisal approximated the fair market value of the rubellite tourmaline. With respect to the loose yellowish-green tourmaline, we are concerned that Michaels valued the stone in the wrong market, and that he determined the value of the stone within that wrong market by equating its value to the value of stones that were more valuable than it. Michaels identified the appropriate market in which to value the tourmaline as the market in which it would be sold by a retail jeweler to a consumer. Rosen and Freedman both agreed that the appropriate market was the wholesale market in which the tourmaline would be sold to a jeweler. Michaels identified the color of the tourmaline as green and therefore estimated its value from the value of green tourmalines. Both Rosen and Freedman agreed that the tourmaline was yellowish-green rather than green, and that it would be worth much more if it was green. [18] Rosen and Freedman also agreed that the cut of the stone was not good to excellent as stated by Michaels. They agreed that the tourmaline had been cut to leave *318 on unnecessary weight. With respect to the pendant, we are concerned that Michaels' lack of first hand knowledge of market prices forced him to rely too heavily on the price contained in a price list. Freedman testified, and the price list cautioned, that the prices contained in the list are not an accurate reflection of fair market value. Cf. Anselmo v. Commissioner,80 T.C. at 878 n. 6. Although Michaels testified that he confirmed the reasonableness of the price with a jeweler, we are unconvinced that the jeweler had the ability to appraise the pendant accurately. The record does not indicate that the jeweler examined the pendant, and does not reveal his experience and credentials. We are also concerned that Michaels' appraisal of the pendant identified the cut of its four diamonds as single cut. Both Rosen and Freedman testified that all of the diamonds are not single cut. Freedman explained that two of the diamonds are of a much older cut. Michaels' misidentification of the cut of the diamonds indicates that he either lacked the expertise to identify *319 the cut accurately or that he did not examine the pendant carefully. We have similar reservations regarding the accuracy of Michaels' appraisal of the value of the ring donated by petitioners. One of the problems we have with Michaels' appraisal is that he valued the tourmaline contained in the ring at $375 per carat retail after determining a wholesale value of $96 per carat. The $375 per carat retail value represents a 290 percent markup on the $96 wholesale value. The testimony of Rosen and Freedman indicated that the standard wholesale to retail markup for this type of jewelry was between 75 and 100 percent. Michaels' valuation of the ring as of December 1980 rather than as of December 1981, the date it was contributed by petitioners, is further evidence of lack of due care in performing his appraisals. In sum, we are convinced that Rosen and Freedman had the personal experience and expertise necessary to appraise the values of the items at issue accurately, and that they performed their appraisals with adequate care. We are not convinced that Michaels had the necessary personal experience and expertise, or that he performed his appraisals with adequate care. We hold that *320 petitioners have failed to prove that the fair market values of the four items at issue exceeded the amounts conceded by respondent: $4,721.55 for 1980 and $5,535 for 1981. [19]
*321 Section 6653(a)
Respondent determined that petitioners are liable for the addition to tax under section 6653(a) for 1980. Petitioners bear the burden of proving that the addition under section 6653(a) determined in respondent's notice of deficiency does not apply. Barton v. Commissioner,424 F.2d 1295, 1296 (7th Cir. 1970), affg. per curiam T.C. Memo. 1969-46, cert. denied 400 U.S. 949 (1970); Luman v. Commissioner,79 T.C. 846, 860-861 (1982). Section 6653(a) imposes an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence under section 6653(a) is defined as lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). The addition to tax under section 6653(a) may not apply when a taxpayer claims charitable deductions in excess of fair market value in good faith and in reasonable reliance on appraisals performed by qualified experts. See Butler v. Commissioner,T.C. Memo. 1985-613. We nevertheless conclude *322 that the addition to tax under section 6653(a) applies in this case. Petitioners failed to introduce into evidence, or testify as to the contents of, any appraisal reports that supported the values of the items they donated in 1980. Without evidence concerning appraisals, we are unable to determine whether petitioners relied on appraisals in claiming the values they reported. Even if petitioners had established that they claimed the values in reliance on appraisals, we would be unable to assess the reasonableness of their reliance without evidence of the qualifications of the purported experts who produced them and the circumstances in which the appraisals were given. The amounts petitioners claimed as charitable contributions in 1980 appear to be unreasonable considering the amounts they paid for the items. All of the expert appraisals presented at trial, including those of petitioners' own expert, confirm that the total value they claimed was excessive. In view of the apparent unreasonableness of the total value petitioners claimed and their complete failure to introduce any evidence that they reasonably relied on expert appraisals in claiming that total value, we hold that *323 petitioners have failed to prove that respondent erroneously determined that they are subject to the addition to tax under section 6653(a) for 1980. Section 6659
Section 6659 provides, as is relevant here, for an addition to tax on underpayments attributable to valuation overstatements. Section 6659(c) defines valuation overstatement to include, inter alia, the claim on a return of a valuation of 150 percent or more of the correct valuation. Respondent determined in his notice of deficiency that the underpayment for 1981 was due entirely to a valuation overstatement of the jewelry donated to the Smithsonian. Petitioners claimed on their 1981 return a value of $21,028 for the jewelry. Petitioners have the burden of proving that they are not liable for the addition to tax under section 6659 as it was determined by respondent in his notice of deficiency, as modified by respondent's concessions herein as to values. Welch v. Helvering,supra; Rule 142(a). We have already held that petitioners have failed to prove that the jewelry was worth more than the $5,535 conceded by respondent. As $21,028 is more than 150 percent of $5,535, we hold that petitioners have failed *324 to prove that they are not liable for the addition to tax provided by section 6659 for 1981. Section 6621(c)
Respondent determined in his notice of deficiency that the portions of petitioners' underpayments for each year at issue that are attributable to their overstatement of the value of their charitable donations are subject to interest at the rate determined under section 6621(c). Section 6621(c) provides for a rate of interest on substantial underpayments attributable to tax motivated transactions of 120 percent of the underpayment rate established under section 6621. The rate applies to interest accruing after December 31, 1984, even if the tax motivated transaction occurred prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); sec. 301.6621-2T, Q-10 and A-10, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50393 (Dec. 28, 1984). To be subject to the rate, the aggregate underpayment for a year attributable to all tax motivated transactions must exceed $1,000. Sec. 6621(c)(2). Tax motivated transactions include, inter alia, valuation *325 overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Petitioners bear the burden of proving that respondent improperly applied the rate of interest determined under section 6621(c). Welch v. Helvering,supra; Rule 142(a). We conclude that petitioners have failed to satisfy their burden of proof. We have already upheld respondent's determination that petitioners' underpayment for 1981 was due entirely to a valuation overstatement. The portion of petitioners' underpayment for 1980 attributable to the deductions they claimed for their donation to the Smithsonian was also due to a valuation overstatement. Petitioners claimed on their 1980 return a value of $27,500 for the three items donated in that year. They stipulated that one of the items was worth only $485, and we held that they failed to prove that the other two items were worth more than the $4,721.55 conceded by respondent. The $27,500 value petitioners claimed is more than 150 percent of the $5,206.55 total of $485 plus $4,721.55. We found as a fact that the underpayments attributable to petitioners' valuation overstatements exceeded $1,000 in both 1980 and 1981. We accordingly uphold *326 respondent's determination that the rate of interest determined under section 6621(c) applies to the underpayments caused by those valuation overstatements. To reflect the foregoing, Decision will be entered under Rule 155.
Appendix Leo J. and Sharon M. Malone, Jr.
Contributions to Smithsonian
1980 and 1981
Value Per
Purchase
Value Claimed
Petitioners'
Item
Price
on Return
Expert Michaels
1980 Donation
Rubellite
Tourmaline
$2,500
$15,000
$15,000
Mineral
Collection
743
1,890
431
Yellowish-Green
Tourmaline
2,414
10,610
7,295
1980 total
$5,657
$27,500
$22,726
1981 Donation
Pendant
$2,000
$ 9,373
$ 8,829
Ring
2,600
11,655
8,735
1981 total
$4,600
$21,028
$17,564
Leo J. and Sharon M. Malone, Jr.
Contributions to Smithsonian
1980 and 1981
Value Per
Respondent's Experts
Item
Freedman
Rosen
Average
1980 Donation
Rubellite
Tourmaline
$2,600
$ *   [1] $2,600.00
Mineral
Collection
485
*   [2] 485.00
Yellowish-Green
Tourmaline
2,386
1,857.10
[1] 2,121.55
1980 total
$5,471
$1,857.10
$5,206.55
1981 Donation
Pendant
$2,608
$2,000   [1] $2,304
Ring
3,712
2,750   [1] 3,231
1981 total
$6,320
$4,750   $5,535
*327 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A)-(C) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750.↩
3. Respondent has conceded that petitioners are not liable for the addition to tax under sec. 6651(a) for 1980. Petitioners have conceded that they understated their taxable dividend income received during 1980 by $96.↩
4. It is stipulated that the Smithsonian is an organization described in secs. 170(c) and 170(b)(1)(A), and that petitioners' contributions to them in 1980 and 1981 are deductible as charitable contributions for Federal income tax purposes.↩
5. The prices petitioners paid are set forth in the Appendix. ↩
6. The values petitioners claimed for the three items are set forth in the Appendix.↩
7. The prices petitioners paid are set forth in the Appendix. ↩
8. The values petitioners claimed for the two items are set forth in the Appendix.↩
9. Respondent determined that the amounts subject to interest at the rate provided by section 6621(c) equaled $12,812.60 for 1980 and $8,887.25 for 1981.↩
10. We treat respondent's present position as a concession, pro tanto, of the values determined in his statutory notice herein. Respondent's experts both appraised the yellowish-green tourmaline and the two pieces of jewelry. The values conceded by respondent represent the average of the valuations of those experts of those three items, plus expert Freedman's valuation of the rubellite tourmaline. See the Appendix for the specific valuations rendered by each of the experts.↩
11. Michaels' appraisals are set forth in the Appendix.↩
12. The record revealed that Michaels had limited knowledge of the gemstone market. For instance, he attended only one gem show in all of 1980 and 1981.↩
13. See Price v. Commissioner,T.C. Memo. 1985-182↩, for a further description of Rosen's qualifications.
14. Michaels did not actually see the jewelry listed in the 1984 catalog, and determined that it contained comparable stones based on the descriptions and illustrations contained in the catalog. The Bell catalogs relied upon by Michaels in preparing his appraisals list two prices for each piece of jewelry advertised. The higher price is a hypothetical price purported to represent the price the item would sell for at a normal retailer. The lower price is the price for which Bell sells the item. Michaels used the higher hypothetical prices rather than Bell's actual retail prices in valuing the items. The hypothetical prices in the 1984 Bell catalog were at least 29 percent more than Bell's actual retail prices.↩
15. Rosen valued both the cut and the color of the stone.↩
16. It is unclear why Michaels determined 1980 prices as the ring was donated in December 1981. Values conceded by respondent. [1]↩7 It is unclear why Michaels used the $375 per carat retail value in his appraisal, as that value is nearly four times the $96 per carat value he determined to be the tourmaline's wholesale value.
18. Freedman testified that color is the most important determinant of the value of colored gems.↩
19. See the Appendix for details of the values conceded by respondent. The $4,721.55 total value of the two items contributed in 1980 is less than the $4,914 petitioners paid for them. Although this Court has recognized that the actual price paid for an item is evidence of the item's fair market value, it has also recognized that the actual sales price is not always the best evidence of value. See Price v. Commissioner,T.C. Memo. 1985-182. It is not unusual for taxpayers who have little expertise in the market for goods to pay more than fair market value for the goods. See, e.g., White v. Commissioner,T.C. Memo. 1987-251↩. In the circumstances of this case, we consider it to be neither surprising nor unusual that petitioners paid more than fair market value for the two items. We would, in fact, have been surprised if petitioners had obtained the items for significantly less than their fair market value as was suggested by their expert Michaels. As respondent's expert Rosen stated, the seller of the items was a knowledgeable dealer of gemstones who would not be expected to give bargains.
*. Item was not valued by expert.↩
2. Value stipulated by parties. ↩