SIDNEY AND SHEILA RIMMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rimmer v. Commissioner
Docket No. 8416-93
United States Tax Court
T.C. Memo 1995-215; 1995 Tax Ct. Memo LEXIS 217; 69 T.C.M. (CCH) 2620; May 18, 1995, Filed *217 Decision will be entered for respondent. P contributed a large collection of sheet music to a qualified sec. 170(c), I.R.C., organization. Ps deducted an amount on account of such contribution, which amount exceeded the permissible amount for the year of contribution. Ps carried the excess over to subsequent years. R disallowed a portion of P's deduction on the ground that Ps had overstated the value of the contribution. Held: R's disallowance is sustained. The value of the contribution was insufficient to provide a carryover to the years in question. For petitioners: Orrin Eliot Tilevitz. For respondent: Peter J. Gavagan. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: Respondent has determined deficiencies in petitioners' Federal income tax of $ 14,949, $ 14,255, and $ 11,037 for petitioners' taxable (calendar) years 1989, 1990, and 1991, respectively. The sole remaining issue to be decided is the fair market value of a quantity of sheet music contributed by petitioner Sidney Rimmer to a charitable organization. [1]
*218 All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Introduction
Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners Sidney and Sheila Rimmer are husband and wife. They made joint returns of income for the years in issue, and they resided in Brooklyn, New York, at the time the petition was filed. Hereafter, the term "petitioner" will be used to refer to Sidney Rimmer. Petitioner's Collection
In May 1974, petitioner purchased approximately 85,000 pieces of Yiddish and Hebrew sheet music from Metro Music Co. (Metro) for $ 10,000. Metro had gone out of business in 1970, and petitioner's purchase was of Metro's remaining, unsold stock of such music. Mostly, the music had been published by Metro from the late 1920's through 1950. With Metro's closing, the sheet music likely would have been abandoned if not for petitioner's purchase. Petitioner was not a dealer in sheet music. He was employed by the City of New York, in *219 the Office of Contract Administration. He purchased the sheet music to save it from destruction and possibly ensure its distribution. He stored the sheet music in his own garage. The sheet music was packaged and stored in filing cabinets purchased specifically for that purpose. Petitioner sold some of the sheet music to individual buyers. Buyers were directed to petitioner by individuals associated with Metro. Buyers contacted petitioner in order to purchase specific pieces of sheet music. The sheet music was stored without any order. That posed difficulties for those interested in obtaining specific pieces from petitioner. Contribution to the National Yiddish Book Center
In 1986, petitioner contributed the remaining sheet music to the National Yiddish Book Center (Center). The Center is located in Amherst, Massachusetts, and is a qualified section 170(c) organization. While the Center had a collection of about one-half million books, its Yiddish sheet music collection numbered about 200 pieces prior to the Rimmer contribution. Although the contribution was of approximately 85,000 separate pieces of sheet music, there were only approximately 650 separate titles among *220 that total. There were between 2 and 1,000 copies of each title in the donated inventory. Most of the titles consisted of individual song folios. However, 28 of the titles were song books containing numerous pieces of music. The collection consisted mostly of Yiddish music, but contained some Hebrew, Zionistic, and instrumental pieces as well. The collection, despite its age, was in new condition. Center's Marketing of the Rimmer Collection
In early 1987, the Center prepared an inventory of the collection. The inventory set out the titles, number of copies of each title, the price the Center intended to set for each title, and the cumulative price of each title, based on the price of one copy multiplied by the number of copies of the title in the inventory. The Center set its prices for the music in part by assessing the current prices of both individual folios and sheet music booklets in local music stores. The Center then prepared two different catalogs containing the prices for the music. The prices for the music differed according to which catalog was being used for ordering music and whether the buyer was a member of the Center. Membership in the Center is open *221 to individuals at a cost of $ 25 per year ($ 15 for students and senior citizens). The first catalog, a comprehensive catalog, set individual prices for each separate title of the entire inventory. The nondiscounted prices ranged between $ 3 and $ 5 apiece for a large majority of the pieces. A handful of book compilations and opera scores were priced between $ 10 and $ 25. The comprehensive catalog also set forth a number of discounts. A 25-percent discount existed for Center members. A 30-percent discount existed for Israeli institutions. A 35-percent discount existed for classroom orders of 10 or more copies of the same title. The second catalog, an illustrated catalog, set package prices for buying multiple titles and encompassed approximately 360 of the 650 titles. The prices set for each item were less than the nonmember price set forth in the comprehensive catalog. Sets of 10 to 20 pieces were available for prices ranging from $ 12 to $ 36. A 25-percent discount existed for members. Through March 1994, sales proceeds for the sheet music were approximately $ 95,000. The sales were made to individual buyers, and 33 universities, libraries, and similar institutions. *222 Leif Laudamus Appraisal
To support his claimed charitable contribution deductions (described below), petitioner sought an appraisal of the contributed collection. Based on the Center's advice, in March 1987, petitioner requested an appraisal from Leif Laudamus, the proprietor of Leif Laudamus Rare Books in Amherst, Massachusetts. Mr. Laudamus appraised the collection at $ 220,120. He reached that figure by adding the prices of each of the 85,000 pieces, as listed in the Center's inventory (which prices are the same as the comprehensive catalog's prices for nonmembers), and dividing the total by two. Petitioners' Deductions
Based on the Laudamus appraisal, petitioners began claiming charitable deductions for the contribution of the sheet music starting with petitioners' 1986 return. For the years 1986, 1987, and 1988 petitioners claimed a total of $ 96,616 of the $ 220,120 music collection appraisal amount as charitable deductions under section 170. The period of limitations for assessment and collection of any deficiency for those years has expired. For the years 1989, 1990, and 1991 petitioners claimed charitable contribution deductions based on the sheet music *223 contribution in the amounts of $ 53,036.75, $ 49,376.39, and $ 22,970.70, respectively. OPINION I. Introduction
Petitioner has contributed a large quantity of sheet music (the collection) to a charitable institution. Petitioners have claimed charitable contribution deductions under section 170. Section 1.170A-1 (c)(1), Income Tax Regs., provides that the amount in money of a contribution of property other than money is the fair market value of the property at the time of the contribution. Fair market value of property is defined for purposes of the charitable contribution deduction as the price, as of the date of contribution, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.
Although the regulations under section 170 do not specify whether a wholesale or a retail market is to be used, the answer clearly provided elsewhere is that the retail market must be used under the circumstances existing herein. See Skripak v. Commissioner, 84 T.C. 285, 321 (1985); *224 Anselmo v. Commissioner, 80 T.C. 872, 881-882 (1983), affd. 757 F.2d 1208 (11th Cir. 1985); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Fair market value is a question of fact to be determined from the entire record. Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioners bear the burden of proof. Rule 142 (a). The facts here are uncomplicated. Petitioner purchased the collection for $ 10,000. The collection consisted of approximately 85,000 pieces, which comprised roughly 650 separate titles. There were between 2 and 1,000 copies of each title in the inventory. Petitioner contributed the collection to the Center. The Center prepared two catalogs, setting prices in part by assessing the current prices of sheet music in local bookstores. The catalogs included discounts for members and institutional purchasers. The majority of the pieces were listed in the catalogs for a nondiscounted price of $ 3 to $ 5. Through March 1994, sales proceeds were approximately $ 95,000. II. Expert Opinions
*225 A. Introduction
In order to prove the fair market value of the collection, both respondent and petitioners have relied on expert witnesses. Rule 143 requires an expert witness to prepare an expert witness report to aid the Court in its final determination. Petitioners argue that the Laudamus appraisal, which valued the collection at $ 220,120, and upon which petitioners based their deductions, is incorrect, because it was based on "wholesale" value, and is therefore "irrelevant". Petitioners rely instead on the appraisal and expert testimony of Dr. Maurice Tuchman, the Library Director of Hebrew College. Dr. Tuchman appraised the collection at $ 340,000. Respondent counters petitioners' experts with her own expert, Gloria R. Mosesson. Ms. Mosesson valued the collection at $ 42,500, or alternatively, at $ 71,045. B. Petitioners' Expert
1. Dr. Tuchman's Appraisal
Dr. Tuchman arrived at his $ 340,000 valuation by multiplying $ 4, his determined per-piece price, by 85,000, the number of individual pieces in the collection. A number of factors led to a $ 4 per-piece valuation: (1) Present prices for sheet music sold in various local general book and music stores *226 were in the $ 3 to $ 3.50 range; (2) prices and sales of Yiddish sheet music through auction houses and auction house catalogs were mostly in the $ 6 to $ 10 range; (3) the conclusion that a number of the pieces are "collectibles" due to either their age or cover design; and (4) the conclusion that Yiddish music popularity is on the rise and a definite market exists for a collection of this size. Dr. Tuchman concludes that his appraisal of $ 340,000 is a "very conservative estimate of the collection['s value]." Dr. Tuchman did not specifically take into account the size of the collection in arriving at his valuation. 2. Analysis of Dr. Tuchman's Appraisal
We do not find Dr. Tuchman's opinion to be persuasive. We are unpersuaded, in major part, because Dr. Tuchman did not specifically take into account the size of the collection and the number of duplicate items. Petitioners argue that a piece-by-piece valuation, without a "bulk discount", should be used to determine fair market value. We disagree because petitioner did not simply contribute one piece, or a few different pieces, of sheet music to the Center. Petitioner contributed approximately 85,000 pieces, mostly duplicates. *227 Without evidence, we will not assume that the retail market could absorb that quantity for immediate sale without some discount. Although there is clear evidence that some, if not all, of the 650 separate titles in the collection were salable, we will not assume that, at any one time, one or more willing buyers could be found for all 85,000 items in the collection. In an analogous situation, concerning a contribution of books, we have said: The major flaw in petitioners' valuation approach * * * is petitioners' failure to consider the sheer numbers of books that are to be valued for each petitioner. As against this, the information relied upon by petitioners is simply insufficient to represent the large universe of reprint titles the Court is called upon to value. Skripak v. Commissioner, 84 T.C. 285, 324 (1985). A determination of the fair market value of a group of items includes a consideration of how many of the items would be available for sale at any one time and the length of time necessary to liquidate the entire inventory. E.g., Calder v. Commissioner, 85 T.C. 713, 722-723 (1985) (blockage discount *228 applied separately to each of six simultaneous gifts of a large number of works of art by one artist). When property is being valued, the number of items of which such property consists, and not simply the value determined for each item, is a relevant consideration. E.g., Rushton v. Commissioner, 498 F.2d 88, 90 (5th Cir. 1974) ("when securities are being valued, the size of the holding, and not simply the quoted price per share is a relevant consideration"), affg. 60 T.C. 272 (1973); Skripak v. Commissioner, supra at 324-325. In Estate of Smith v. Commissioner, 57 T.C. 650, 658 (1972), affd. 510 F.2d 479 (2d Cir. 1975), we were required to value a sculptor's collection of 425 of his own works of art. We said: We think that, at the very least, each willing buyer in the retail art market would take into account, in determining the price he would be willing to pay for any given item, the fact that 424 other items were being offered for sale at the same time. The impact of such simultaneous availability of an extremely large number *229 of items of the same general category is a significant circumstance which should be taken into account. In this connection, the so-called blockage rule utilized in connection with the sale of a large number of securities furnishes a useful analogy. * * * [Fn. ref. omitted.] Furthermore, where all the items in an inventory cannot be sold simultaneously, carrying costs constitute a relevant factor. Estate of O'Keeffe v. Commissioner, T.C. Memo. 1992-210. Petitioners' expert merely arrived at a per-piece value that he multiplied by 85,000, the number of individual items. He did not take into account the sheer size of the collection and the effect on the market price that the addition to the market of such a huge collection would have. There is nothing in the record that would indicate that a comparable quantity of music existed for sale during the years in question. Indeed, the evidence supports a contrary conclusion. The existing market was small. Petitioners' expert based his appraisal on sales of no more than 100 pieces. Respondent's expert makes reference to collections in New York and in the Library of Congress, which number in the thousands. *230 However, those collections were evidently not for sale on the public market. We conclude that the addition of 85,000 pieces of sheet music on the public market either would depress the market for each title or, perhaps more likely, would result in many copies being unsalable for a considerable period of time. To reflect those possibilities, we believe that a discount, in the nature of a discount to reflect blockage, is appropriate. See Skripak v. Commissioner, 85 T.C. at 324-325. Petitioners argue that their expert effectively included a blockage discount into his appraisal due to the fact that the stores and catalogs upon which his appraisal was based implicitly included a blockage discount in their pricing. There is nothing in the record to support that hypothesis. In any event, it is irrelevant. What is relevant is the consequence of an additional 85,000 pieces coming into the market. Besides the issue of a discount to reflect the size of the collection, we have other difficulties with Dr. Tuchman's opinion of the value of each individual piece of sheet music. Dr. Tuchman arrived at his average value per item in part by referring to sales *231 prices set forth in catalogs and at music stores. Dr. Tuchman, however, admitted that the catalog and music store prices that he used included the prices for general interest sheet music that would have a much larger marketing audience than the Yiddish and Hebrew sheet music at issue herein, which is an extremely specialized type of music appealing to a limited audience. In addition, the catalogs he used were from 1990 and thereafter, 4 years after the date of the contribution. Further, he looked at music store prices in 1994, some 8 years after the contribution date. Without more, we can place little reliance on those prices as indicative of prices in 1986. Dr. Tuchman also asserts that he examined comparable sales of Yiddish sheet music in determining his per-item value. The purported comparable sales, however, occurred in 1990 through 1993 and, with one exception in 1993 of an auction of 99 items, generally encompassed the sale of between 15 and 32 items a year. Accordingly, the sales should not be considered comparable in that the quantity considered was insignificant when compared to the quantity (85,000 items) involved in the present case, and the earliest sales occurred *232 some 4 years after the valuation date at issue herein. Dr. Tuchman did not refer to any of the sales catalogs prepared by the donee in arriving at his average per-item price. Most importantly, he did not refer to the illustrated catalog wherein the majority of the donated inventory was being offered for sale at an average price of approximately $ 1.50 per-item. These catalogs from which actual sales were being made should have been important to Dr. Tuchman if he wanted to discover comparable sales. In fact, the illustrated catalog would have given Dr. Tuchman a strong indication that the bulk of the inventory was being offered for sale at an average price per item for nonmembers that represented a discount of approximately 60 percent from the average price per item ($ 4) he used in determining his value of the inventory. [2] Dr. Tuchman has disregarded in the illustrated catalog what could be considered a substantial component of the potential retail market for the sale of the subject sheet music. *233 Petitioners' expert failed to base his valuation on the appropriate factors and standards that we have discussed. We cannot, therefore, accord his appraisal much weight as an aid in determining the collection's fair market value. C. Respondent's Expert
On the other hand, respondent's expert, Gloria Mosesson, made her valuations based on the factors and incorporating the standards we have deemed requisite in determining fair market value. Ms. Mosesson arrived at two alternative values, each of which, in part, results from an analysis we can use as an aid in determining the fair market value of the collection. 1. The $ 42,500 Valuation
Ms. Mosesson reached a fair market value of $ 42,500. She calculated this figure by multiplying 85,000, the number of pieces, by 50 cents, her per-piece value. She reached that value by considering a number of factors overlooked by petitioners' expert, Dr. Tuchman. First, she recognized the limited market for a Yiddish music collection of such a vast quantity. The music was not rare or unique. A majority of items were published in the 1940's, when Yiddish theater and music were in declining popularity, and were, therefore, not among *234 the top offerings in that field. Second, she added in the fact that the length of time required to sell the entire collection would be substantial. Even Dr. Tuchman admitted that it would take at least 20 years to sell all 85,000 pieces. Finally, she relied on the fact that Metro, the publisher of the music, was not preeminent in the field. Its music was of lower value. Adding all those factors led her to a 50 cents per-item value. 2. The $ 71,045 Valuation
Ms. Mosesson determined, alternatively, that the collection had a fair market value of about $ 71,045. To reach that figure, Ms. Mosesson used the Center's prices as a basis for what the retail market for the music would be. She applied a 25-percent discount to account for the various discounts offered in the catalogs. She further applied discounts to account for relevant factors such as (1) costs of preparing an inventory and a catalog, (2) marketing expenses, (3) inventory retention and shrinkage, (4) the collection's vast quantity, and (5) the length of time it would take to sell the music. All of those are factors to be taken into account when determining fair market value. D. Bulk Discount
Respondent, *235 in addition to Ms. Mosesson's valuations, posits that the music be valued using a blockage discount based on an analysis of the item's present value as of the contribution date. Respondent argues: Under this approach, as used by this Court in Calder v. Commissioner, 85 T.C. 713, 724-726 (1985), realization of the value of the sheet music can be compared to the right to receive an annuity of a stated amount over a given period, and the present value of such annuity can be determined from the appropriate valuation tables. Gift Tax Reg. § 25.2512-5A(d)(6). This can be accomplished by treating the sheet music as assets the worth of which could be realized only through the liquidation over a period of time at a uniform rate, [6] yielding an assumed amount of dollars each year over such period. *237 Calder v. Commissioner, supra at 724. Using this methodology and assuming that the entire inventory will be sold over 20 years and that the average retail price per item is $ 1.70, [7] the present value, and, hence, fair market value of the contribution as of July, 1986, would be $ 61,511.00. This result was calculated as follows: *236 [8]
Present [9] value factor Average number
at 10 percent
of items sold Average price
= Determined
for annuities
X
per year
X
per item Value 8.5136
4,250 [10]
$ 1.70
$ 61,511.00
This calculation recognizes that an ascertainable comparable market for this type and bulk of sheet music is the market created by the donee through its catalogues. In addition, it takes into account material factors affecting fair market value such as the quantity involved in the donation, the time interval required for liquidation through sale of the entire inventory and discounts offered by the seller. Including other relevant factors, such as carrying costs and marketing and inventory expenses, respondent arrives at a fair market value "in line with the $ 42,500 fair market value determined by Ms. Mosesson." E. Discussion
We are materially aided in determining the *238 fair market value of the collection both by respondent's expert, Ms. Mosesson, and by respondent's Calder analysis. We believe that, when contributed, the value of the collection was not in excess of $ 71,045, Ms. Mosesson's alternative valuation. Since, however, petitioners deducted their contribution in what, in effect, amounts to installments, and the period of limitations expired on $ 96,616 of such installments, it is sufficient that we find that the fair market value of the collection was not in excess of $ 96,616, and we so find. III. Conclusion
Having found that the collection had a fair market value not in excess of $ 96,616 when it was contributed to the Center in 1986, we sustain respondent's disallowances of deductions for 1989 through 1991 on account thereof. We hold that petitioners were entitled to no charitable deductions on account of the contribution of the collection to the Center during 1989, 1990, or 1991. Decision will be entered for respondent. Footnotes
1. A portion of the deficiency for 1991 results from incorrect computations of passive losses and itemized deductions and is not in dispute. ↩
2. In fact, the illustrated catalog also offered discounts in a similar manner to the comprehensive catalog. The average $ 1.50 price in the catalog should be reduced to reflect such advertised discounts, since the potential consumers who would be receiving the catalog would already be members of the National Yiddish Book Center.↩
6. Based on the record in this case the majority of the sales of the sheet music by the donee occurred in the first years after the issuance of the catalogues and sales dropped off dramatically thereafter. Although it does not appear that annual sales of the times would be uniform, for purposes of determining the present value of the sheet music as of the contribution date under the sophisticated approach used by this Court in Calder↩, respondent assumes that the entire inventory will be sold uniformly over a period of 20 years, the time frame asserted by Dr. Tuchman.
7. This average per item price of $ 1.70 was determined based on the fact that at least 75 percent of the inventory was offered for sale in the illustrated catalogue for average approximate price of $ 1.50 per item while using Dr. Tuchman's $ 4.00 per item price for the remaining 25 percent of the inventory. Further, an average discount factor of 20 percent was applied to the total to account for the discounts offered in both catalogues.↩
8. See Calder v. Commissioner, supra↩ at 726.
9. The present value factor is taken from Table B of Estate Tax Reg. § 20.2031-7A(d)(6) in accordance with Gift Tax Reg. § 25.2512-5A(d)(6)(ii) to determine actuarial factors showing the present worth at 10 percent of an annuity for a term certain of 20 years.↩
10. 85,000 items divided by 20 years.↩