JAMES H. RHOADES and CORLIN A. RHODES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rhoades v. Commissioner
Docket No. 28497-84.
United States Tax Court
T.C. Memo 1988-279; 1988 Tax Ct. Memo LEXIS 307; 55 T.C.M. (CCH) 1159; T.C.M. (RIA) 88279; June 28, 1988. James M. Sullivan, for the petitioners. Rebecca T. Hill, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By a notice of deficiency in petitioners' Federal income taxes for the taxable year 1981 in the amount of $ 10,185 and additions to tax under sections 6653(a) [1] and 6659 in the respective amounts of $ 509 and $ 3,056. The issues *308 for decision are: (1) whether petitioners are entitled to a charitable contribution deduction for 1981 in excess of $ 10,459.77 for an opal donated to Stanford University; (2) whether petitioners are liable for an addition to tax for negligent underpayment of tax pursuant to section 6653(a); and (3) whether petitioners are liable for an addition to tax for an underpayment attributable to a valuation overstatement pursuant to section 6659. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioners James H. and Corlin A. Rhoades (petitioners) resided in Salt Lake City, Utah, at the time of filing their joint petition. Petitioners were cash method taxpayers and used the calendar year. During the year in issue, both petitioners were airline pilots. Mr. Rhoades also maintained a dog breeding business and held a part interest in a family owned ranch. In the spring of 1971 petitioners decided to invest in diamonds as an alternative to stocks and bonds during a period of heavy inflation which eroded their confidence in the securities market. Petitioners bought three *309 diamonds from Gary Almond (Almond) of G. Almond, Ltd. [2] The diamonds which petitioners purchased were accompanied by certificates attesting to the size and quality of each gem. [3] Petitioners had never before invested in any gemstones. On August 9, 1979, petitioners purchased two opals from Almond. Although Almond was generally a dealer, selling gemstones he actually owned, he acted as a broker for the true owner, with respect to the opals petitioners purchased. The two opals, originally mined in Coober Pedy, Australia, weighed 37.97 carats (the larger opal) and 35.17 carats (the smaller opal or the donated opal). The two opals were presented to petitioners as a collection pair and were matched in color and design, an unusual attribute in opals. The smaller opal was described as having dimensions of 24.60 X 45.68 X 4.82 *310 mm., with a harlequin pattern of green, violet, yellow and red on a dark grey base. Petitioners paid $ 15,540.23 and $ 10,459.77, respectively, for the two opals. Prior to the time of purchase Almond obtained three separate appraisals for the opals. Each appraisal was done by a well known and respected gem appraiser. David T. Wilber (Wilber) was recommended to Almond by the Gemological Institute of America (GIA), while Albert L. McGuinness (McGuinness) was recommended by the de Young Museum. Joel E. Arem (Arem) was a curator at the Smothsonian Institute and had written textbooks on minerology. Each appraisal was based on an actual physical inspection and examination and was prepared without knowledge of the actual sales price. Almond explained that because opals such as those purchased by petitioners were extremely rarely traded they were difficult to value precisely. The appraisals were, therefore, obtained primarily for identification purposes in the event of theft or loss, [4] although the values given on the appraisals at the time of purchase were within a reasonable range. The three appraisals were as follows: Per Carat
Total Value
McGuinness'
Large Opal
$ 2,000
$ 76,000.00
Small Opal
1,500  52,750.00
Arem's
Large Opal
1,750  66,482.50
Small Opal
1,000  35,170.00
Wilber's
Large Opal
2,200  83,534.50
Small Opal
650    22,860.50
*311 All of the appraisals gave values which were considerably higher than the actual purchase prices because the opals were available as a result of a forced sale. [5] The range between appraisals fell within the 25 percent variation which was considered generally acceptable in the gem business at that time. [6]
Petitioners were given these appraisals at the time of sale. Almond also gave petitioners a letter dated May 30, 1979, in *312 which D. Vincent Manson, Director of Research at the Gemological Institute of America (GIA), wrote that petitioners' opals were uncommon specimens of excellent quality. On December 29, 1981, petitioners donated the smaller opal to the Department of Geology, School of Earth Sciences at Stanford University. In anticipation of making the donation, petitioners obtained a second appraisal from McGuinness. McGuinness, relying on his 1979 appraisal [7] and increasing the value for inflation, gave a new appraisal value for the small opal in the amount of $ 70,000, [8] an increase of 32.7 percent over the 1979 appraisal value. Petitioners did not obtain any other appraisals nor did they seek to independently verity McGuinness' qualifications. Petitioners received letters from professors and administrators at Stanford University thanking them for the gift and praising the quality of the donated opal. *313 On their joint income tax return for taxable year 1981, petitioners claimed a deduction for a charitable contribution in the amount of $ 40,619, reserving the remainder of the $ 70,000 total for the following tax year. Respondent disallowed the amount of the deduction in excess of the purchase price of $ 10,459.77. [9]
OPINION Section 170 generally provides a deduction for contributions made to charitable institutions, subject to certain restrictions which are not at issue here. The regulations promulgated under section 170 provide that, with respect to a contribution of property other than money, the amount of the deduction is the fair market value of the contributed property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. The regulations define fair market value as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell *314 and both having reasonable knowledge of the relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
The sole issue in dispute between the parties is the value of the opal which was contributed to Stanford University. Respondent maintains that the purchase price which petitioners paid in 1979 is the only reliable basis for determining the fair market value of the opal at the time of contribution. Petitioners, on the other hand, contend that the appraisal value given by McGuinness in the 1981 appraisal which was obtained immediately prior to the contribution is the most reliable and accurate evidence of the opal's fair market value. Petitioners have the burden of proving that they are entitled to the deduction which they claimed. Welch v. Helvering,290 U.S. 111 (1933); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Rule 142(a). In determining the fair market value of the opals on the date of contribution, we consider all the testimony, including any expert testimony proffered. We are not bound by the opinion of any expert witness where the opinion is contrary to our own judgment, even where only one party presents an expert witness. *315 Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955). Furthermore, we are not constrained by the estimates of either of the parties and may reject the values put forth by both parties in favor of the value which, after consideration of all the factors, most accurately reflects the value of the property. Chiu v. Commissioner,84 T.C. 722, 734 (1985); Buffalo Tool & Die Mfg. Corp. v. Commissioner,74 T.C. 441, 451 (1980). Fair market value is a question of fact to be determined from the entire record. Zmuda v. Commissioner,79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). If the contributed property was purchased in an arm's-length transaction within a short time before the date of contribution, the sales price is evidence of value. Chiu v. Commissioner, supra.[10] The value of the property is most accurately determined within the context of its own particular market. Skripak v. Commissioner,84 T.C. 285, 324-325 (1985); Anselmo v. Commissioner,80 T.C. 872, 883 (1983), *316 affd. 757 F.2d 1208 (11th Cir. 1985). Although several very knowledgable witnesses testified at trial, only McGuinness was formally accepted as an expert. Respondent did not introduce any expert testimony. McGuinness studied geological engineering at the University of California and has been a collector of gemstones for over 46 years. For the past 15 years he has been a dealer in gemstones, specializing in rough uncut gemstones. He frequently attends gemstone shows and has occasionally judged amateur gemstone and mineral collecting contests over the *317 past 25 years. He has appraised gemstones for several scientific institutions including the United States Geological Survey and the Smithsonian Institute, as well as for several insurance companies. McGuinness explained that the market for opals is small and distinct, making it very difficult to precisely determine an opal's fair market value. The individual judgment of the dealer is the most common arbiter of value, although gem and mineral shows where the dealers assemble to sell their stones to collectors and other dealers are a primary resource for information concerning the fair market value of opals. [11] All the witnesses agreed that the opals owned by petitioners were of exceptional quality and value, although the larger opal was more beautiful than the smaller. In fact, Almond had purchased only seven opals of such quality in his entire career as a gemstone dealer. Opals of the size and quality of those owned by petitioners are so infrequently traded that few publications list prices for comparison. *318 Not only are opals rarely traded but they also vary considerably in quality and color making them difficult to compare. Opals range in background color from clear to black although McGuinness noted that true black opals have been impossible to obtain for quite a while. An opal with an opaque, dark background color is considered more valuable than one with a lighter, more transparent hue. In their initial appraisals, McGuinness, Wilber and Arem all described both of the opals which had been purchased by petitioners as "semi-black" and therefore demanding a higher price than a lighter opal. The value of an opal is also enhanced by a bright and varied "display color," the internal color of opals. Because reds and greens are rarer in an opal display color scheme than yellows and blues, the presence of reds and greens make an opal more valuable on the market. The opals petitioners owned had display colors of all hues and were of a high quality and value. A consideration unique to the opals owned by petitioners is that they were a matched set. Almond explained that they came from the same mineral specimen and shared certain markings and color displays. This made them unusually *319 valuable as a pair. When petitioners donated one but not both they diminished the value of each opal, by an amount which ranges between 10 percent and 25 percent. In determining a fair market value in the amount of $ 52,750 for the donated opal in 1979, McGuinness drew primarily on his extensive knowledge of and familiarity with the gemstone market. In comparison with the prices for opals of lesser quality at gem shows, particularly the Tucson gem show, McGuinness arrived at an appraisal figure that was reasonable for exceptional opals. Further, McGuinness checked his appraisal figure with two other gemstone dealers who had experience selling opals, Jack Davidson of Davidson's Opals and A. Volante from American Gem Market System. Finally, in a letter to petitioners dated March 12, 1984, McGuinness noted that he had consulted the price list published by the American Gem Market System in the Precious Gem Investor. Unfortunately, petitioners failed to introduce this price list into evidence. We found McGuinness to be a credible and knowledgable witness. Petitioners received three different appraisals from Almond at the time of purchase, which had been prepared without knowledge *320 of the actual sales price and which ranged in amount from $ 52,750 to $ 22,860.50. Despite the fact that all of the witnesses agreed that the valuation of exceptional opals is highly subjective, we cannot accept all three of these figures as the fair market value of the donated opal at the time of purchase. Petitioners have demonstrated that the donated opal was an exceptionally fine and unusual gem, and that its value at the time of purchase vastly exceeded its actual purchase price. In making our determination we take into account that respondent presented no independent evidence of value to support his claim that the purchase price accurately reflected the opal's value at the time of contribution and we therefore reject that proposition. Because we find McGuinness' explanation of the method he used to arrive at the figure he gave for the 1979 appraisal to be well reasoned and credible, we are convinced that his 1979 appraisal value reflected the true fair market value of the donated opal at the time it was purchased by petitioners. Therefore, as a first step, we conclude that the fair market value of the donated opal at the time of purchase was $ 52,750. In explaining the *321 increase in the appraisal values from $ 52,750 in 1979, to $ 70,000 in 1981, McGuinness stated that he had merely adjusted the 1979 figure for inflation. Because the gemstone market had remained strong he simply multiplied his original appraisal value by 15 percent to accommodate the effect of inflation. However, a simple mathematical calculation demonstrates that the increase between the two figures is actually 32.7 percent. In the letter dated March 12, 1984, McGuinness sent petitioners a price list for 1983, published in the Precious Gem Investor, Vol. 2 No. II. The price list gave the per carat range for "finest gem grade opal" as between $ 2,000 and $ 3,000 per carat. However, evidence of the opal's fair market value in 1983 is not helpful. [12] The fair market value of the donated opal on the date of contribution, December 29, 1981, is the only value which concerns us here. Because MgGuinness gave no alternative bases for the increase in appraisal values and because petitioners failed to submit into evidence a price list relevant to taxable year 1981, we decline to accept McGuinness' testimony at face value. *322 After careful consideration of all the evidence, we conclude that the donated opal was one of a very few exceptionally beautiful and valuable opals which are commercially available. However, McGuinness' explanation of the figure in his 1981 appraisal was not helpful, and we must rely on our own resources in determining the fair market value of the donated opal, an endeavor which has been termed "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." Messing v. Commissioner,48 T.C. 502, 512 (1967). Both Almond and McGuinness testified at trial to the effect of inflation on the price of opals during the period between the purchase and the contribution of the donated opal. Almond estimated that the value of the donated opal had increased by 10 or 15 percent, while McGuinness placed the amount of the increase at 14.3 percent. There was no evidence that either McGuinness or Almond was using an exact figure which accurately represented the rate of inflation for the years between 1979 and 1981. Rather, they were both estimating, based on sound judgment and experience as gemstone dealers, that the value of opals had increased by 10 or *323 15 percent between 1979 and 1981. [13] Because both Almond and McGuinness were familiar with the gemstone market during the period with which we are concerned, we conclude that the value of the donated opal increased 15 percent between the date of purchase and the date of contribution. Furthermore, Almond testified that the separation of the opals caused by the donation of the small opal alone to Stanford University would decrease the appraised value by an amount between 10 and 25 percent, since the appraisals were all based on the assumption that the two opals were a matched pair. Thus, based on careful consideration of all the evidence presented to us, including the demeanor of the witnesses at trial, we conclude that the value of the donated opal at the time it was contributed was $ 50,000. The second issue for our consideration is whether any part of petitioners' underpayment of tax was attributable to negligence or *324 intentional disregard of the rules pursuant to section 6653(a)(1). Petitioners bear the burden of proving that additions to tax determined by respondent should not be sustained. Hall v. Commissioner,729 F.2d 632 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; Luman v. Commissioner,79 T.C. 846, 860-861 (1982). Negligence under section 6653(a)(1) is lack of care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners, who had no particular expertise of their own in the area of gemstone evaluation, consistently relied on appraisals provided by individuals whom they believed to be experts. Prior to buying the two opals, petitioners received valuations from three appraisers who had been selected by Almond, an experienced gemstone dealer. The discrepancy between the purchase price and the appraisal values was further confirmation that they had made an exceptional bargain. Petitioners had no reason to *325 suspect that these three appraisers were anything other than knowledgable and trustworthy. When petitioners decided to donate the smaller opal to Stanford University, they obtained an appraisal from one of the same experts who had provided the original appraisals, and were confident in relying on an expert who had been chosen by Almond. In all respects petitioners comported themselves as ordinarily prudent persons and, therefore, we conclude that they have met their burden of proving that respondent's determinations pursuant to section 6653(a)(1) are erroneous. [14]
The third and final issue for our consideration is whether petitioners are liable for an addition to tax pursuant to section 6659 for an underpayment in income tax attributable to a valuation overstatement. Section 6659(c) defines a valuation overstatement as a claimed value of 150 percent or more of the correct *326 value. Petitioners bear the burden of proving that respondent's determinations are erroneous. Zirker v. Commissioner,87 T.C. 970 (1986); Rule 142(a). Because 150 percent of the correct value of the donated opal ($ 50,000) would be $ 75,000, section 6659 is inapplicable and respondent's determination is not sustained. In summary, after carefully considering all the evidence, we conclude that the fair market value of the donated opal equalled $ 50,000. Accordingly, petitioners are entitled to a charitable contribution in that amount. Furthermore, petitioners are not liable for additions to tax under either section 6653(a)(1) or 6659. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioner had first learned of Almond by looking in the phone book to get an appraisal on a piece of diamond jewelry. ↩
3. The certificates, which are widely used in diamond trading, contain sufficient information about the diamonds they describe that sales can be made on the basis of the certificate alone without an examination of the actual diamond. ↩
4. Almond noted that because opals of the size and quality of those purchased by petitioners were uncommon there were no listings for fair market value to which he could turn for a reliable appraisal and he was forced to obtain independent appraisals. ↩
5. At the time of sale, Almond indicated to petitioners that the opals were being sold incident to divorce proceedings. ↩
6. Reid Rutherford, Almond's partner in a gemstone dealership formed subsequent to Almond's sale of the opals to petitioners and a gemstone dealer of long standing, indicated that the 25 percent varation margin pertained only to appraisals of stones for the retail jewelry market. A gemstone the size and quality of petitioners' opals would not be cut up and used for jewelry. ↩
7. McGuinnes stated that he did not need to see the opal again after having examined it thoroughly in 1979. ↩
8. McGuinness stated that the value of the larger opal had increased to $ 104,000 at the time of the second appraisal although the value of the larger stone is not in issue. Petitioners obtained a second appraisal of the larger opal from McGuinness in 1981. ↩
9. In the statutory notice of deficiency respondent disallowed the entire charitable contribution deduction but subsequently, prior to trial, conceded a charitable contribution deduction limited in amount to the purchase price of the opal. ↩
10. See generally Schachter v. Commissioner,T.C. Memo. 1986-292 (cost to taxpayer best evidence of value when property purchased approximately a year before contribution); Lampe v. Commissioner,T.C. Memo. 1985-236 (cost to taxpayer a year before purchase most reliable evidence of value); Price v. Commissioner,T.C. Memo. 1985-182 (cost was not reliable where property acquired expressly to donate to charity); Theodotou v. Commissioner,T.C. Memo. 1985-181 (same result); Talebi v. Commissioner,T.C. Memo. 1985-180↩ (same result). 11. Reid Rutherford, (Rutherford) a former partner of Almond's in a gemstone dealership called Bentlye, Almind, and Rutherford, concurred in this assessment. He explained that the America Gemological Laboratories, which he had co-founded, was organized to attempt to formulate uniform standards of comparison for colored gemstones, similar to those already widely used for diamonds. Because opals of a size and quality suitable for collectors and investors were so rare and so unique, they could not be meaningfully compared. The appraisal of opals, Rutherford notes, was a matter of the individual judgment of the experienced gemstone dealer, while the tools and measurements useful for comparing other colored gemstones were not helpful with respect to opals. Rutherford indicated that tools and chemical analyses were only useful in discerning whether an opal had been artificially altered or treated to create a false impression of value beyond the true worth of the stone. ↩
12. In the letter attached to the price list, McGuinness indicated that the range for opals from a 1981 price list would be "comparable" but this, unfortunately, falls short of compelling evidence of the 1981 fair market value of the donated opal. ↩
13. Almond testified that the gemstone market remained strong during the early 1980's. Indeed, he said that the price for diamonds tripled in 1979 alone, reflecting lack of public confidence in the stock market. Almond gave no support for this theory. ↩
14. See Butler v. Commissioner,T.C. Memo. 1985-613↩, wherein we held that the addition to tax under section 6653(a) may not apply when a taxpayer claims charitable deductions in excess of fair market value in good faith and in reasonable reliance on appraisals performed by qualified experts.