**Viea M. TAYLOR, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C-1-90-202.**

United States District Court, S.D. Ohio, W.D.

Sept. 9, 1991.

Paul David Rattermann, Thomas Henry Clark, Clark & Eyrich, L.P.A., Michael E. Neiheisel, Cincinnati, Ohio, for plaintiffs.

Nicholas John Pantel and Gerald Francis Kaminski, U.S. Dept. of Justice, Cincinnati, Ohio, Henry J. Riordan, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## FINDINGS OF FACT AND
## CONCLUSIONS OF
## LAW

ROBERT A. STEINBERG, United States Magistrate Judge.

This case is before the Court following a trial to the Court and post trial briefs. Plaintiff Viea M. Taylor, in her personal capacity and as executrix of the estate of her late husband Francis K. Taylor, and the estate itself, sued for a refund of federal income taxes. The parties unanimously consented to trial and entry of final judgment by the United States Magistrate Judge. At the conclusion of plaintiffs' case-in-chief, the Court granted defendant's motion for involuntary dismissal.

### FINDINGS OF FACT

1. All plaintiffs reside within the jurisdiction of the Court. Francis K. Taylor, who died March 10, 1983, was the husband of Viea M. Taylor.

2. On October 20, 1982, Mr. and Mrs. Taylor filed a joint federal income tax return for the calendar year 1981. On that return, they claimed a $42,500 charitable contribution deduction consisting of property other than money. The return contained no information about the basis for the deduction.

3. On July 5, 1983, Mr. and Mrs. Taylor filed a joint federal income tax return for the calendar year 1982. On that return, they claimed a $38,897 charitable contribution deduction consisting of cash given to "Mount Vernon Nazarene" and "Landmark Christian." They provided no other information.

4. Donald Goodwin, a certified public accountant, prepared the Taylors' 1981 and 1982 federal income tax returns. He was their advisor on tax and financial matters.

5. The Internal Revenue Service (IRS) conducted an audit of the Taylors' 1981 and 1982 federal income tax returns and issued

a notice of deficiency on April 13, 1989. The notice disallowed $2,500 of the $42,500 charitable contribution deduction claimed for the year 1981, and it disallowed the entire $38,987 charitable contribution deduction claimed for the year 1982.

6. On August 31, 1989, the IRS assessed a tax deficiency of $1,333.18 for the Taylors' 1981 federal income tax return, plus penalties under 26 U.S.C. §§ 6653(a) and 6659 in the amounts of $1,150.81 and $266.64, respectively, as well as $2,359.05 in interest. On the same date, the IRS assessed a tax deficiency of $19,445.50 for the Taylors' 1982 federal income tax return, plus penalties under §§ 6653(a) and 6659 in the amounts of $12,596 and $3,889.10, respectively, as well as $26,029.62 in interest.

7. On September 8, 1989, the Taylors paid the sum of $67,069.90 to the IRS in full payment of the assessed tax deficiencies, penalties, and interest.

8. On September 29, 1989, the Taylors filed two separate refund claims respecting their 1981 and 1982 federal income tax returns. They based their refund claims on the ground that they contributed data processing equipment with an appreciated value of $81,872 to public charities during 1981; therefore, they were entitled to the charitable contribution deductions claimed on the 1981 and 1982 returns.

9. On November 27, 1989, the IRS denied the refund claim, stating: "You have not provided any additional information for consideration. The information you submitted was considered during the examination of your return and our determination was rendered at that time." (Jt.Exs. 9, 10).

10. On March 13, 1990, the Taylors commenced this action seeking a refund of $67,069.90, plus interest.

The events leading up to the claimed deductions are as follows:

11. In 1975, Joseph Chevrolet (Joseph), a Cincinnati, Ohio, automobile dealership, established a corporation known as Cincinnati Computer Graphics (CCG) to operate its automotive accounting services. Joseph's data processing department was then moved to CCG. In addition, CCG became a dealer for General Automation model 440 mini computers. A minicomputer is more powerful than a personal computer—it supports multiple users running multiple tasks at the same time.

12. In 1975, Joseph purchased from General Automation a new model 1830 computer system for use by CCG in Joseph's data processing department. The parties did not present competent evidence of the cost of the 1830 system. Although this system was then outmoded and being phased out by General Automation, it suited Joseph because it was capable of operating Joseph's existing accounting software. Joseph used the system daily to manage its data processing from the time it was purchased in 1975. The 1830 system was large, estimated to require about half the size of the courtroom in which this case was tried. The system operated by the use of eighty-column cards which had to be inserted into a card reader. It required special three-phase electrical wiring, a 30 ampere fuse and two dedicated electrical lines.

13. General Automation produced the model 440 mini computer system to replace the model 1830 system. The 440 was more powerful and more modern than the 1830. As a 440 dealer, CCG attempted to convert Joseph's existing accounting software to operate on the model 440, but was unsuccessful. CCG then developed a different type of software, which was compatible with, and was sold with, the model 440 computer systems.

14. Robert Braley was CCG's manager. CCG never prospered and ceased business sometime before 1979. When CCG ceased business, Braley began his own computer sales business. During 1978, Joseph Chevrolet asked Braley to attempt to sell CCG's 1830 and 440 computer systems. Braley contacted a number of people, including the Taylors' accountant, Donald Goodwin, to generate interest in purchasing the equipment. No one expressed interest in the 1830. Only Goodwin was interested in the 440.

15. Sometime during 1979, Goodwin arranged to have CCG's equipment examined by Bruce Campbell, Vice President for Sales of Management Decisions Development Corporation (MDDC) in Fairfield, Ohio. MDDC bought and sold new and used computer equipment, including General Automation computer systems. Goodwin was a financial advisor to MDDC and also prepared Campbell's tax returns. MDDC's President was a member of the Board of Directors of Mount Vernon Nazarene College, to which a portion of the equipment was eventually donated. Goodwin's daughter attended Landmark Christian School, to which the remainder of the equipment was donated.

16. Sometime during 1979, Campbell examined the equipment. This was his "first exposure with that particular equipment." (Tr. 235). Although the equipment was not part of MDDC's product line, Campbell claimed that he "was fairly familiar with the entire GA product line." (Tr. 236). He opined that the computer equipment was in good operating condition. He discussed the value of the equipment with Goodwin, but does not recall the value he placed on it in 1979.

17. Goodwin then contacted Joseph Chevrolet directly and offered to pay $40,000 for the model 440 system, which he wished to use in his accounting practice. Joseph Chevrolet rejected the offer, because it wished to dispose of both computer systems. Goodwin made a second offer of $45,000 for both systems, and Joseph accepted. Because the computer equipment had been exposed to dust and dirt during renovations to the building where it was stored, Joseph agreed to reduce the price to $43,000. Goodwin accepted delivery of both computer systems. He used the model 440 system in his accounting practice, and he stored the model 1830 system, for which he had no use, in his garage.

18. Goodwin devised a plan to transfer the cost of his new computer system to his clients, the Taylors. He convinced Mr. Taylor to purchase the model 1830 system by arranging a substantial tax deduction. As Goodwin planned it, Mr. Taylor would pay him $40,000 for the 1830 computer system stored in his garage and Goodwin would arrange to donate the system on behalf of the Taylors to a charitable institution. Goodwin calculated a charitable contribution deduction for the Taylors totaling $81,897 for the model 1830 system that had cost him $3,000. The Taylors' deduction and subsequent tax savings would offset the $40,000 paid to Goodwin, while Goodwin would obtain a 440 system for his own use that was worth at least $40,000.

19. Acting on Goodwin's advice, Mr. Taylor purchased the model 1830 system from Goodwin for $40,000. Goodwin claimed at trial that he believed the 1830 equipment was worth $100,000 and $40,000 was "a number that was very conservative."[1] The record does not reflect whether Goodwin made such a representation to the Taylors. On November 12, 1980, Mr. Taylor executed a $40,000 note payable to Goodwin in one year. (Pl.Ex. 1) One year later, Mr. Taylor paid Goodwin $12,000 and executed a $28,000 note payable to Goodwin in one year. (Pl.Ex. 2).[2] Mr. Taylor satisfied the $28,000 note on December 9, 1982.

20. Goodwin represented on his own federal income tax returns that he paid $5,000 for the 1830 system and that he sold parts of the system over a period of two separate years. Goodwin reported on his 1981 federal income tax return that he sold "printers and form burst" (referring to a portion of the 1830 system he sold to Mr. Taylor) on December 30, 1981, for $12,000. (Df.Ex. 3). He reported the cost of this equipment to be $3,000. *Id.* Goodwin reported on his 1982 federal income tax return that he sold "computer equip" (again referring to the 1830 system) on December 20, 1982, for $28,000. (Df.Ex. 4). He re-

---

**1.** In view of the entirety of the evidence summarized herein, we find this testimony totally incredible.

**2.** Plaintiffs' exhibits 1 and 2 purport to be copies of the original notes obtained from Goodwin. However, the copies submitted to the Court are unsigned. The parties have not challenged their authenticity.

ported the cost of this equipment to be $2,000. *Id.* Thus, Goodwin reported a total profit of $35,000 on the sale. The record does not reveal whether Goodwin informed the Taylors that he reported a $35,000 profit on the transaction. Goodwin profited from his fiduciary relationship with the Taylors at their expense.

21. In order to obtain a charitable deduction for the Taylors, Goodwin arranged to donate the Taylors' 1830 system to two educational institutions with which he was familiar, but to which the Taylors had no apparent connection: Mount Vernon Nazarene College and Landmark Christian School.

22. Sometime in November or December of 1981, Goodwin discussed a contribution of computer equipment with Steve Doneges, Director of the Administrative Computer Services Department, Mount Vernon Nazarene College, Mount Vernon, Ohio. Goodwin described printers and a "forms burster" and asked if Mount Vernon College could use such equipment. (Tr. 155). Doneges agreed to accept it. Goodwin told him it would have to be evaluated (apparently for tax deduction purposes) before delivery.

23. Goodwin requested Campbell at MDDC to obtain a written evaluation of the 1830 computer equipment, which was at that time stored in Goodwin's garage. Campbell did not examine all the equipment before rendering his opinion. Goodwin told Campbell that he was purchasing this equipment and wanted to know the price for which it could be resold. (Tr. 237). Campbell based his evaluation on "fair market value for an end user at that point in time." (Tr. 237). Campbell valued the equipment to be given to Mount Vernon Nazarene College at $27,000 and the equipment to be given to Landmark Christian School at $54,872. (Pl.Ex. 8). In fixing the value, Campbell assumed the equipment was in working order. He did not investi-

gate actual sales of the same used equipment, but merely referred to pricing books which listed the proposed prices for which such equipment would sell on the open market, including prices of new equipment. Campbell stated he was not qualified to conduct the tests necessary to evaluate the 1830 equipment.

24. During March 1982, Goodwin delivered two printers and one "forms burster" to Mount Vernon Nazerene College. (Pl. Ex. 17) The college's records reflect that the equipment was donated by the Taylors. *Id.* The college valued the equipment at $19,200 for its own records. *Id.* This value was not determined by an appraisal, but on Goodwin's advice. The college utilized the equipment in its data processing department.

25. During December 1982, Goodwin delivered three pieces of computer equipment, including a "mainframe" computer, to Landmark Christian School.[3] While the equipment was available for examination by students, it was never made operational because it required a type of wiring that was not present in the school's computer department. Furthermore, the computer instructor doubted he had the knowledge to operate the equipment. Richard Schranker, Jr., Landmark Christian School Principal, determined that "it would not be worth the money that we would have to spend to get the unit up and in working order, that we could purchase a personal computer that could do everything that machine could do in our environment, and it would fit on a desk top or a table." The equipment remained in a storage area until the school disposed of it.

26. The only evidence of fair market value of the 1830 computer system in the years 1981 or 1982 is the $3,000 paid for it by Goodwin in addition to the $40,000 he paid for the model 440 system, and the resale of the equipment by Goodwin to Mr. Taylor for $40,000.

---

**3.** It is not clear whether the three pieces of equipment included all of the items listed on Plaintiffs' Exhibit P–6. Representatives of Landmark Christian School were not able to specify exactly what equipment was received beyond stating that it consisted of "three

pieces." Although Goodwin testified that all of the listed equipment was delivered to Landmark, we find his testimony not credible based upon his demeanor at trial and on his apparent violation of his fiduciary duty to the Taylors. *See infra,* pp. 1214.

## OPINION

Federal income tax deductions are a matter of legislative grace. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934). A taxpayer seeking a deduction must be able to show that he comes within the terms of an applicable statute. *Id.*

The Taylors are entitled to a charitable deduction if plaintiffs show that they come within the terms of 26 U.S.C. § 170(a)(1) (1981), which provides, in pertinent part:

There shall be allowed as a deduction any charitable contribution ... payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

Pursuant to § 170(a)(1), the Secretary of the Treasury issued 26 C.F.R. § 1.170A–1(a)(2)(ii) (1981), which provides, in pertinent part:

If an individual taxpayer makes a charitable contribution of an item of property other than money and claims a deduction in excess of $200 ..., then he shall attach to his income tax return the following information ...

(a) The name and address of the organization to which the contribution was made.

(b) The date of the actual contribution.

(c) A description of the property *sufficient to identify the particular property contributed, including in the case of tangible property the physical condition of the property at the time of the contribution.*

(d) *The manner of acquisition of the property, ... and the approximate date of acquisition of the property by the taxpayer.*

(e) The fair market value of the property at the time the contribution was made, *the method used in determining the fair market value, and, if the valuation was determined by appraisal, a copy of the signed report of the appraiser....*

(h) *The terms of any agreement or understanding entered into by or on behalf of the taxpayer which relates to the use, sale or disposition of the prop-*erty contributed, as, for example, the terms of any agreement or understanding which— ...

(3) *Earmarks contributed property for a particular charitable use, such as the use of donated furniture in the reading room of the donee organization's library.*

(emphasis supplied).

When a taxpayer claims a charitable contribution of property other than cash, the amount of the deduction is generally the fair market value of the property, reduced as provided under 26 U.S.C. § 170(e)(1), relating to appreciated property. "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 1.170A–1(c)(2) (1981).

▌ Fair market value is a question of fact to be determined from the record. *Rhoades v. C.I.R.,* T.C.Memo. 1988–279, 55 T.C.M. (CCH) 1159, 1161 (1988). "In determining fair market value, all factors bearing on value are relevant, including, when pertinent, the cost or selling price of the item, sales of comparable properties, cost of reproduction, expert-opinion evidence, and expert appraisals. Absence of a readily available market price does not preclude a valuation if the property can be identified with actual commercial market activity." *Transamerica Corp. v. United States,* 15 Cl.Ct. 420 (1988), *aff'd* 902 F.2d 1540 (Fed. Cir.1990). Generally speaking, the most probative evidence of fair market value are the prices of similar items which are sold in arms length transactions within a short time of the date of contribution. *Rhoades,* 55 T.C.M. at 1161.

▌ Comparable sales are not the only method through which value can be proven. *See e.g. Estate of Kaplin v. C.I.R.,* 748 F.2d 1109 (6th Cir.1984); *Goldman v. C.I.R.,* 388 F.2d 476 (6th Cir.1967). List prices contained in catalogs, however, are not evidence of value unless there is also evidence that the items listed actually sold

at such prices. *Mack v. C.I.R.*, T.C.Memo 1980–401, 40 T.C.M. (CCH) 1288 (1980). There must be an actual market for the items listed in order for the list prices to be relevant. *Goldman,* 388 F.2d at 478.

■ Plaintiffs failed to establish that they met the requirements of 26 C.F.R. § 1.170A–1(a)(2)(ii) (1981) italicized above. On their 1981 return, the Taylors list a charitable contribution of property in the amount of $42,975. An "Attachment to Schedule A" consists of a letter from Mrs. Taylor to the University of Cincinnati Foundation specifically identifying certain property donated to the Beta Theta Pi Fraternity, listed at a cost (rather than fair market value) of $475. The remaining $42,500 in property contributed is entirely unidentified. *See* Jt.Ex. J–1. On their 1982 return, the Taylors list a charitable contribution of property in the amount of $38,897 to "Mount Vernon Nazarene" and "Landmark Christian." No other identification of the contribution is made. *See* Jt.Ex. J–2. Thus, none of the $81,397 charitable contribution at issue meets the requirements of the applicable Treasury Regulation and Statute.

There is a serious question as to whether any charitable donation was made in 1981, since the 1830 equipment was delivered to both institutions during the year 1982. It is unnecessary to resolve this issue, however, in view of our findings below.

■ Plaintiffs have failed to establish a fair market value of the donated property in excess of the $40,000 allowed by IRS. To establish the value of a six year old 1830 system that, by 1981, had been used about three hours daily for four years and in storage about two years, plaintiffs offered the testimony of three witnesses: John Appel, Bruce Campbell, and Robert Braley.

Appel is President of Industrial Electronic Resources, Corona, California, a manufacturer of mini computers that periodically bought and sold used General Automation equipment. He was familiar with the installation of 1830 systems and the model numbers and descriptions of the components of the system. Appel identified the components of the 1830 system in question in this case in a 1979 new price book to determine what the equipment listed for new in 1979. He then opined that two or three year old 1830 equipment would have sold for sixty to seventy percent of the 1979 new price. However, Appel gave no basis for that opinion and was not aware of any actual sales of comparable equipment. Although his company was involved in the sale of used General Automation equipment, he gave no information as to any sale his company made of used 1830 systems.

Bruce Campbell is the former owner and present employee of Decision Tree Systems, specializing in customized computer systems for the steel service and pulp and paper industries, and in 1979 was Vice President of Sales of MDDC, Fairfield, Ohio. MDDC's primary business was supplying custom computers to the pulp and paper industries. It also sold equipment in the college environment and sold specialized systems for mathematical applications. MDDC was one of the largest dealers of new General Automation computer equipment. MDDC bought new 440 equipment, integrated it with other equipment, and marketed it under another name. It did not sell or service 1830 systems. To determine the value of the 1830 system in question, Campbell referred to the General Automation new price list, the General Automation "hotline" listing of new and used prices. Campbell did not feel he was qualified to conduct the tests necessary to evaluate the 1830 equipment.

Robert Braley, of Hope, Michigan, owns Braley Communication Systems, which manufactures and sells communications systems to law enforcement authorities. In 1981, he was President of Omega Computer Consultants, which sold computer hardware and software. Omega took over all of the eight "outside accounts" of CCG, of which Braley had been President. It had some dealings in General Automation equipment. However, neither Omega nor CCG sold or serviced 1830 systems. The 1830 system in question in this case was owned by CCG. It was purchased in 1975, before Braley joined the company. Braley

revealed no personal knowledge of the purchase price of the 1830 or whether it was new or used when purchased. Goodwin was Braley's personal accountant for about eight years in the 1970s. Braley estimated the prices in Plaintiff's Exhibit 9 by examining list prices of new and used 1830 equipment "and figuring some value somewhere between the two."

None of these witnesses testified to an actual sale of used General Automation 1830 computer equipment, but instead relied on list prices for new or used equipment. Plaintiffs have failed to present any authority, and we are aware of none, that such asking prices may be used to establish fair market value. This testimony failed to establish the fair market value of the 1830 system in 1981.

The only other evidence of fair market value is the additional $3,000 Goodwin paid to add the 1830 system to his purchase of the 440 system for $40,000.[4] There is some evidence to corroborate this low price. The 1830 required substantial space; it required special wiring; it was outmoded and had been phased out and replaced by the 440; it had been in constant use for four years, then stored for two years and exposed to dust and dirt. Braley, who searched for prospective purchasers of the 1830 system, was able to find none. Goodwin was not really interested in it, but bought it in order to finalize his purchase of the 440 system.

Mr. Taylor's payment of $40,000 for the 1830 system is not convincing evidence of its fair market value. It is questionable whether Mr. Taylor was a willing buyer in an arm's length transaction. Goodwin appears to have abused his fiduciary relationship with the Taylors by making a profit of $37,000 on the transaction while the Taylors received in return a questionable income tax deduction.[5] It is fair to assume that Mr. Taylor was not aware that the

1830 system cost Goodwin only $3,000 and that Goodwin made at least a $35,000 profit from Taylor's payment. By charging Taylor $40,000, Goodwin was able to obtain the 440 system, which was worth at least that much, for a net investment of only $3,000. Under these circumstances, we do not believe the Taylor purchase is evidence of fair market value. However, even if it were such evidence, the IRS has allowed $40,000 in calculating the deficiency. Thus, plaintiffs failed to offer competent evidence in their case-in-chief that the charitable contributions in question were worth more than the $40,000 the IRS allowed.

In reaching these conclusions, the Court is not unsympathetic to the plight of the Taylors, who were following the advice of their accountant and financial advisor, who devised this entire transaction and profited at their expense. As a result of Goodwin's scheme to obtain the 440 computer at bargain basement rates, the Taylors expended $40,000 in payment to Goodwin, an additional $67,069.90 in payment to the IRS, and an unknown amount in attorney's fees to prosecute this case. They fit the role of the victims more so than the wrongdoers. Nevertheless, sympathy for the Taylors is not a good reason to require the taxpayers to reimburse them. Their relief, if any, must come from the individual who led them into this quagmire.

IT IS THEREFORE ORDERED THAT:

Plaintiffs' complaint be DISMISSED pursuant to Fed.R.Civ.P. 41(b) because, upon the facts and the law, plaintiffs have shown no right to relief.

---

**4.** Although Goodwin claimed on his federal income tax return to have paid a total of $5,000 for the 1830 system, there is no evidence to support that claim.

**5.** Goodwin's tax return report of a $35,000 profit on this transaction is strong evidence that at

least such profit actually occurred. His report caused his gross income to increase by $35,000, thereby substantially increasing his taxes. We can think of no reason why Goodwin would have reported such a profit if it had not existed.